TONY MARTIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 51062. Filed October 24, 1955.

*J. Everett Blum, Esq.*, for the petitioner.
*Joseph G. White, Esq.*, for the respondent.

---

95

98

OPINION.

FISHER, *Judge:* Petitioner contends that his loss upon a loan to Marston, which became worthless in 1949, constitutes a business bad debt, while respondent has determined that the loss incurred was from a nonbusiness bad debt. The ultimate issue is whether the loss resulting from the acknowledged bad debt was proximately related to the conduct of petitioner's business as an entertainer.

Under section 23 (k) (1), a bad debt incurred in a trade or business is deductible in full in the taxable year in which it becomes worthless, while all other bad debts constitute nonbusiness bad debts and are treated as short-term capital losses in accordance with section 23 (k) (4). The respondent's regulations, Regulations 111, section 29.23 (k)–6 (derived from H. Rept. No. 2332, 77th Cong., 2d Sess., p. 76; 1942–2 C. B. 431), provide, in pertinent part, as follows:

A non-business debt is a debt, other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business and other than a debt evidenced by a security as that term is defined in section 23 (k) (3). The question whether a debt is one the loss from the worthlessness of which is incurred in the taxpayer's trade or business is a question of fact in each particular case. The determination of this question is substantially the same as that

which is made for the purpose of ascertaining whether a loss from the type of transaction covered by section 23 (e) is "incurred in trade or business" under paragraph (1) of that section.

The character of the debt for this purpose is not controlled by the circumstances attending its creation or its subsequent acquisition by the taxpayer or by the use to which the borrowed funds are put by the recipient, but *is to be determined rather by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt is not a non-business debt for the purpose of this section.* [Emphasis supplied.]

There cannot be any serious doubt that petitioner, during 1949, was individually engaged in a trade or business, specifically, that of being an entertainer, including, in the instant case, being a motion picture actor, nightclub performer, and singer on stage, screen, and radio. See *Olivia de Haviland Goodrich*, 20 T. C. 323 (1953) ; *William Lee Tracy*, 39 B. T. A. 578 (1939) ; *Reginald Denny*, 33 B. T. A. 738 (1935). Petitioner has been so engaged in his trade or business from 1932 to date, except for a few years during World War II when he was a member of the Armed Forces.

The only issue, therefore, in determining the business or nonbusiness character of the bad debt in question is whether there existed in the instant case the requisite proximate relation of the bad debt loss to the conduct of the taxpayer's business. Such question is one of fact to be decided upon the particular circumstances involved in each case. *Samuel Towers*, 24 T. C. 199 (1955) ; *Robert Cluett, 3rd*, 8 T. C. 1178 (1947). The evidence shows that we have accordingly found as a fact that the $12,000 loss sustained by petitioner in 1949 from a bad debt was incurred in his trade or business and constituted a business bad debt deductible in that year in accordance with section 23 (k) (1). Our reasons for so finding are set out below.

It should be noted at the outset that petitioner does not contend that he was in the business of producing motion pictures or in any business consisting of investing in and financing of the production of motion pictures. Nor does he contend that he was engaged in a business of promoting, organizing, managing, financing, or loaning moneys to corporations for the purpose of producing motion pictures or for any other purpose. Petitioner, therefore, does not attempt to come within the scope of the so-called promoter cases, such as *Weldon D. Smith*, 17 T. C. 135 (1951), revd. (C. A. 2, 1953) 203 F. 2d 310; *Henry E. Sage*, 15 T. C. 299 (1950) ; and *Vincent C. Campbell*, 11 T. C. 510 (1948). The record indicates quite clearly that exclusive of his relationship to the Marston enterprise petitioner has never produced or financed the production of a motion picture, or in any way engaged in the production of a motion picture, except as he was employed to act and sing, which employment represented the conduct of his own business as an entertainer. The bad debt loss in issue must,

therefore, be proximately related to the conduct of petitioner's business as an entertainer which involves mainly rendering his personal talent services to others.

Petitioner in his argument respects fully the separateness of the business of the corporate entity from that of its stockholders, *Burnet* v. *Clark*, 287 U. S. 410 (1932) ; *Omaha National Bank* v. *Commissioner*, (C. A. 8, 1950)' 183 F. 2d 899, and does not argue that the corporate form should be ignored. In essence, he argues that the primary reason for producing the motion picture "Casbah" was the promotion again or protection and saving of his career and business. He points out that completion of the motion picture was essential to accomplishment of this objective and that the movie could not have been completed had not petitioner and the others loaned additional moneys to Marston. Petitioner concludes that in such circumstances the loss from worthlessness of the debt was proximately related to the conduct of and incurred in petitioner's trade or business.

We agree with petitioner's conclusion. The loan which here gave rise to the bad debt in issue was not contemplated at the time of organization of the enterprise. It appeared to everyone at that time that all the necessary financing was available to Marston to complete and distribute the movie "Casbah." But after commencing production, the so-called second money which had been promised was withdrawn and additional financing which was necessary to complete production could only be obtained from petitioner, Goldstone, and a few others interested in the production, individually. This was done primarily with a view to the necessity of so completing the picture if petitioner was once again to be able to achieve a measure of public acceptance and thus rehabilitate his career. At least such motivation must be considered as petitioner's primary purpose even if Goldstone or the others were more interested in personally protecting the investment they had already made in the production.

There has been no contention by petitioner that the organization and financing of a corporation to produce a motion picture might conceivably constitute an element of or facet of the conduct of his business as an entertainer,[1] but only that while such was not within the scope of the normal conduct of his business, in the circumstances of this case, when it became necessary to make the loan to Marston

---

[1] See *Commissioner* v. *Stokes' Estate*, (C. A. 3, 1953) 200 F. 2d 637, affirming a Memorandum Opinion of this Court, where the taxpayer was considered to have been engaged individually in the business of exploiting patents sometimes through the media of a corporation established to do so, and *Dalton* v. *Bowers*, 287 U. S. 404 (1932), relied on in the instant case by respondent, where the Supreme Court had earlier reached an opposite conclusion upon the facts of that case, holding that the taxpayer there was not engaged in such a business of exploiting his inventions through corporations organized for that special purpose and forming a complete and comprehensive enterprise of which the corporation was but a part.

to complete the picture which might and subsequently did serve to save petitioner's business and rehabilitate his career, such loan was business connected and even crucial to the ultimate carrying on of that business. We think it evident from the record that investment in the production of a motion picture by a corporation or otherwise was not a normal part of petitioner's business activity as an entertainer. But we think it is also clear that at the point it became necessary to supply additional funds to the corporation to complete the picture, production of which had been undertaken in the first instance to rehabilitate petitioner's career and reestablish him in the motion picture industry as an entertainer and to promote and save that career, such advances as were made by petitioner were made in connection with his business and were proximately related to the conduct of that business as the exigencies of the situation required. We do not consider this loan as an ordinary and necessary expense of petitioner's business since it clearly was neither an expense (being a loan to be repaid) nor a normal part of that business, but only that the loan and the loss sustained upon the worthlessness thereof was incurred in the carrying on of petitioner's business and was essential to the carrying on of that business.

While there are no cases involving precisely the circumstances here involved, we think that our view is supported largely by *Robert Cluett, 3rd, supra,* and *Stuart Bart,* 21 T. C. 880 (1954), and that *Putnam* v. *Commissioner,* (C. A. 8, 1955) 224 F. 2d 947, affirming a Memorandum Opinion of this Court and *W. A. Dallmeyer,* 14 T. C. 1282 (1950), are readily distinguishable.

In *Cluett,* the taxpayer's business consisted of acting as the floor member for various partnerships at the New York Stock Exchange. In this connection he owned a seat on the Exchange. Petitioner sold a fractional accretion to his Exchange seat and accepted in part payment certain promissory notes. A portion of this indebtedness became worthless in 1943 after the buyer became bankrupt. We held that the loss sustained was from a business bad debt, indicating that the debt and loss therefrom arose in the course of petitioner's business, which involved owning an Exchange seat, and that a sale of the accretion thereto was necessary if the taxpayer was to realize any benefit therefrom. It was clear, however, that such was not a usual or common event in the conduct of the taxpayer's business, but was, nevertheless, incident thereto.

The *Bart* case, decided on the authority of *Cluett,* is perhaps more like the instant case. There the taxpayer was engaged in business as an advertising agent. A certain corporate publication was one of petitioner's clients. Through that relationship petitioner had obtained other clients, some of whom advertised in the aforementioned

publication. At certain times petitioner made loans to the publication in an effort to retain it as a client on a profitable basis and also to hold onto other clients' advertising in the publication. We concluded that the loss incurred upon the loans which subsequently became worthless was a business bad debt incurred in the conduct of the taxpayer's trade or business and related thereto.

The crucial tests underlying our decision in *Bart* are brought out clearly in the *Putnam* case. There the taxpayer was a practicing attorney. He made loans to clients to engage in a publishing venture which ultimately was not successful. It was held that the losses incurred were from nonbusiness bad debts and not business bad debts because they were not proximate to or incurred by the taxpayer in his business as an attorney. It was pointed out that it was not in any way essential to his law practice (business) for the taxpayer to make such loans, while in *Bart* it does appear to have been so for his business, and, again unlike the situation in *Bart*, that the particular publishing business was not directly or even closely connected with the taxpayer's practice of law.

The *Dallmeyer* case is similarly distinguishable in that there was no proximate relation between the acquisition of and loss upon certain unsecured notes from the bank of which the taxpayer was chief executive and his business as chief executive, such acquisition and loss having been a consequence of only a moral responsibility he felt and not a part of the conduct of his business activity.

In the light of the foregoing, we hold that petitioner is entitled to a deduction in 1949 for a loss from a business bad debt.

In view of our conclusion, it is unnecessary to consider petitioner's argument based on the recent decision in *George J. Schaefer*, 24 T. C. 638 (1955), and we merely indicate that the circumstances in the two cases are materially different from each other.

*Decision will be entered under Rule 50.*