EDWARD KOPPELMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SANFORD KOPPELMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HYMAN KOPPELMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 51067, 51068, 51069. Filed November 29, 1956.

*Lawrence R. Bloomenthal, Esq.*, for the petitioners.
*Lyman G. Friedman, Esq.*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined the following deficiencies in the petitioners' income taxes for the year 1946:

| Docket No. | Deficiency |
| --- | --- |
| 51067 | $3,408.77 |
| 51068 | 2,874.09 |
| 51069 | 3,813.92 |

These deficiencies arose as a result of the Commissioner's disallowance of certain portions of 1948 net operating loss carrybacks claimed by each of the petitioners. The bulk of each loss carryback consisted of each petitioner's share of a bad debt of $42,642.56 allegedly sustained in 1948 by the partnership, in which they were partners, in the ordinary course of its trade or business. The only issue for determination is whether the partnership sustained a business bad debt loss in 1948.

### FINDINGS OF FACT.

The petitioners in this case are Edward Koppelman, Sanford Koppelman, and Hyman Koppelman. They are individuals who were residents of Cleveland, Ohio, during the taxable years 1946 to 1948, inclusive.

During the years 1946 to 1948, and for a number of years prior thereto the petitioners were members of a partnership doing business under the name of Ohio State Beverage Company, hereinafter referred to as the partnership, with its principal office located at Cleveland, Ohio.

Edward, Sanford, and Hyman filed their individual income tax returns for 1946 and 1948 with the then collector of internal revenue for the eighteenth district of Ohio. They also filed or caused to be filed partnership returns of income for the partnership for those years with the same collector.

During the years 1946 to 1948 the partnership was engaged in the business of operating retail beer, wine, and soft drink beverage stores in Cleveland and throughout the State of Ohio. It also operated home delivery routes throughout Cuyahoga County as part of the beverage business. In 1948 it operated the Trenton Sales Agency which concentrated on the sale, promotion, and advertising of Imp Ale. At the peak of its operations in 1947 the partnership operated 17 retail stores in Cleveland and 15 others in various counties of Ohio.

The partnership was formed in 1942, though the petitioners who are brothers had been in business with another brother, Joseph Koppelman, for several years prior to that. A fifth brother, Harry Koppelman, was a partner from 1942 until 1944. Edward, Joseph, Sanford, and Hyman are hereinafter referred to collectively as the partners.

In 1948 Joseph, who had been in the beverage business since 1931, was the managing partner of the partnership.

During the first 9 months of 1946 the retail beer business in Cleveland was booming. However, grain was being rationed to the various breweries in the United States on a percentage basis and a shortage of beer arose as a result. Retail outlets were consistently sold out of beer. This condition existed from approximately April 1946 to the close of September 1946, at which time the Government dropped grain restrictions to breweries.

The partnership's beer supply was seriously threatened by the grain shortage. In order to maintain existing stores and to secure beer for their accounts and home delivery routes, the partners decided to purchase a brewery, in spite of the fact that they had no experience in manufacturing beer. In March or April of 1946 they purchased more than 90 per cent of the stock of the Trenton Brewing Company, an Illinois corporation, hereinafter referred to as Trenton, and $38,-500 in Trenton's notes, which were secured by a mortgage on the equipment, buildings, and fixtures of the brewery. The notes were previously held by Trenton's former officers and stockholders. The total purchase price was $95,000. Trenton could produce about 4,000 cases of beer per week with its quota of grain. Hence, if one-third of this was left in the local market then the partnership would receive approximately 2,500 cases per week from Trenton during the period grain was rationed.

Ohio regulations, in 1946 and subsequent years, did not permit stores engaged in the sale of beer at retail to import beer directly from out of State. Also, a retail store was permitted only to sell beer at the retail level though a wholesaler could sell beer at both wholesale and retail. During the years 1946 to 1948 the partnership held only retail permits. The partners satisfied themselves that they were not violating Ohio law by operating retail stores in Ohio

and at the same time being stockholders of a brewery corporation operating in Illinois.

In November 1946 the partners held a meeting in Cleveland which concerned the future operations of Trenton. During the summer of 1946 both Trenton and the partnership had made substantial profits as a result of the manufacture and retail sales of the beer brewed by Trenton. However, when the beer shortage ceased, the partnership found that it did not have outlets for the beer brewed by Trenton. Edward, who had been managing Trenton, wished to sell Trenton so that he could return to Cleveland and his family. The other partners however wished to speculate on another grain shortage and thus operate the brewery throughout 1947.

There was no grain shortage in 1947 and there was plenty of beer available that year. Trenton had poor sales and reported an ordinary operating loss of approximately $38,000 on its income tax return for 1947. The partnership had to close some of its stores and sell certain portions of its business in 1947. That year the home delivery route was operated at a loss. The partnership reported a loss in excess of $40,000 for 1947 in its information return.

At the end of 1947 the partners decided to go into a new venture. Although Trenton lost money in 1947, its accounts payable to outsiders was only about $8,000. The partners felt that Trenton could not continue as a regular beer-producing brewery and be successful. However, they thought that with their knowledge of the beer distributorship business through Ohio they could sell a new idea. Therefore they decided to manufacture a 6-ounce bottle of ale at Trenton, which they would sell through the partnership in Ohio. Actually the partners decided to brew beer and add a small amount of ale flavoring to it, rather than manufacture genuine ale, which was the usual procedure of most brewers of ale. Their idea was to hit the market of people who would like ale flavored beer and who would like it in small bottles.

The partners' main objection to brewing ale in Illinois for sale in Ohio was that the freight rates from Trenton to Ohio were about 25 to 30 cents a case, while delivery charges to outlets in Ohio from a brewery centrally located in Ohio would only cost about 5 cents per case. Hence, prior to their decision, Joseph visited the Consumers Brewing Company in Newark, Ohio, to determine the cost of having the ale manufactured by a third person in Ohio, where the ale was intended to be sold. Consumers Brewery, however, added a markup of 30 to 35 cents per case on their estimated cost and so the partners determined that in spite of the freight rates they would profit more by brewing the ale in Illinois.

The partners thought that they would make a larger profit on the ale by selling it in 6-ounce rather than 12-ounce bottles since the

O. P. A. restricted Trenton's price for a case of the latter to $1.28 as opposed to 90 cents a case for the former.

The partners named their new product "Imp Ale" and had it trade-marked in the name of the partnership, at the partnership's expense. Ownership of this trade-mark was never transferred from the partnership to Trenton.

In January and February 1948 Joseph traveled throughout Ohio investigating the market for the new product. A planned advertising campaign was agreed upon which included 1-minute advertisements prior to the Cleveland Indians ball games on television. The outlets contacted by Joseph were promised coverage on the television.

In March 1948 the partnership placed an order for glass bottles in Trenton's name. It also made arrangements to obtain the various supplies, such as bottle caps, labels, foil for the bottle neck, and the ingredients, for producing ale by Trenton.

The sale of Imp Ale was solely and wholly a part of the partnership's operations. It spent about $42,000 during 1948 in connection with sales promotion activities. These activities consisted mainly of various types of advertising and travel and related expenses incurred in promoting the ale with distributors. These expenses were deducted in computing partnership net income for 1948 and were allowed in full by the Commissioner.

A new bottle washer costing about $8,000 had to be purchased in order to bottle ale in the 6-ounce bottles. Also glass bottles and caps costing an additional $8,000 to $10,000 had to be purchased. In planning the new venture the partnership was prepared to purchase the caps and bottles and to make a downpayment of $2,000 or $3,000 on the bottle washer.

Unforeseen technical difficulties were encountered by Trenton in producing Imp Ale. For example, the new bottle washer was too fast for the filler; the pasteurizer was too slow for the bottle washer; and the labeler was too slow for both the bottle washer and the pasteurizer. Correction of these difficulties added unforeseen expenses to production of the ale.

Trenton used about 2 days a week to brew and bottle beer for its local market. The balance of the week was spent producing Imp Ale.

Trenton produced a substantial quantity of Imp Ale in 1948 which it shipped to customers obtained by the sales division of the partnership. Such division was known as the Trenton Sales Agency. Joseph personally sold many cases of Imp Ale in the Ohio market and other sales were made by distributors and agents appointed by Joseph through the partnership.

Trenton was operated by the partnership as a separate entity. The price it charged the partnership for Imp Ale included a markup over cost so that Trenton could make a profit from its operations.

Eighteen different distributors handled Imp Ale in 1948. A total of 17,102 cases were purchased by such distributors that year, with the first sales being made in May and the last in October 1948, as follows:

| Month | Cases sold |
|---|---|
| May | 4, 545 |
| June | 5, 618 |
| July | 4, 415 |
| August | 404 |
| September | 1, 420 |
| October | 700 |

On the basis of sales made in May, June, and July, the partners had placed large orders for glass bottles, tax-paid crowns, and raw materials. However, sales dropped off sharply in August, September, and October, with no prospect of their picking up again. The 6-ounce bottles of Imp Ale were novelties. In general, distributors and customers would purchase them once and that was all. Empty cases and bottles were returned to Trenton. It had on hand at the end of October, large quantities of bottles, tax-paid crowns or bottle caps, and raw materials, for brewing ale.

It was impossible to cancel the orders for some of the materials, such as the crowns for the bottles which were stamped with the name Imp Ale and "tax paid."

In October or November 1948 the partners held a meeting at which they decided to terminate the Imp Ale venture. They decided to operate the business until the beer in the vats and other materials on hand such as tax-paid crowns, were used up. Several thousand cases of ale were thus produced in the early months of 1949.

Trenton reported a loss of $64,057.25 on its corporation income tax return for the year 1948.

Trenton was adjudicated bankrupt in June 1949.

At December 31, 1948, the partnership's books showed that a total of $79,542.38 had been advanced to Trenton during 1947 and 1948 and that credits and repayments from Trenton in the amount of $36,899.82 had been offset against the total funds advanced, leaving an account receivable due of $42,642.56.

Trenton's books contained an account called "Accounts Receivable—Trade." At December 31, 1948, this account reflected a credit balance of $41,661.89 which consisted of an amount due from miscellaneous trade debtors of $980.67 and an amount owed by Trenton to the partnership of $42,642.56. Trenton's practice of combining the money due the partnership with the amounts due from debtors had started in prior years and had never been changed.

The balance of $42,642.56 due to the partnership from Trenton at December 31, 1948, was charged off at that date by the partnership as a bad debt.

The partnership filed a claim against Trenton for $42,642.56 in the bankruptcy proceedings but it did not receive a dividend for its claim.

At the bankruptcy sale the partnership was awarded the land, buildings, machinery, and equipment of Trenton for the $38,500 in notes it held and which were secured by the mortgage on the above-mentioned properties, since there were no higher bids on the property at the sale.

Prior to the end of 1948 Edward made several trips to the surrounding breweries in the Trenton, Illinois, area in an attempt to sell the brewery in its entirety as an operating business, or to sell the products of the brewery by bottling beer for other brewers. He was unsuccessful in all of these attempts.

The partnership's advances to Trenton in 1948 were not part of its cost of purchasing Imp Ale.

In 1948, the trade or business regularly carried on by the petitioners was that of distributing beverages at the retail level.

The petitioners have not shown that, in 1948 or prior years, they were engaged in the trade or business of lending money to corporations or of promoting, organizing, or financing them. The petitioners were not engaged in the brewery business, which was Trenton's business.

The partnership's advances to Trenton were not proximately related to the beverage distribution business conducted by the partnership.

The petitioners' losses which resulted from the advances to Trenton by the partnership were not incurred in any trade or business in which the petitioners were engaged.

## OPINION.

The deficiencies in the petitioners' income taxes for the year 1946 arose as a result of the Commissioner's disallowance of certain portions of 1948 net operating loss carrybacks claimed by each of the petitioners. The bulk of each loss carryback consisted of each petitioner's share of a bad debt of $42,642.56 allegedly sustained in 1948 by the partnership, in which they were partners, in the ordinary course of its trade or business. The sole issue in this case is whether the partnership sustained such bad debt loss in 1948 in the ordinary course of its trade or business. The bad debt arose as a result of advances from the partnership to Trenton which are alleged to have become worthless in 1948. Such advances were made for the purpose of enabling Trenton to produce small bottles of Imp Ale for distribution primarily by the partnership.

The Commissioner contends that the advances to Trenton were not debts but were capital contributions. Alternatively he contends that

if the advances constituted debts, then they were nonbusiness debts. And, further, he contends that regardless of whether the advances are characterized as debts or capital contributions, they did not become worthless in 1948. The petitioner contends that it was improper for the Commissioner to disallow that part of the 1948 net operating loss carryback which was attributable to the loss which resulted to the partnership from advances made by it to Trenton and which had become worthless.

The petitioners rely on three theories to support their position. The first is based on our decision in *Western Wine & Liquor Co.*, 18 T. C. 1090 (1952), appeal dismissed 20 F. 2d 420 (C. A. 8, 1953). The petitioners argue that the advances to Trenton by the partnership would have been treated as part of the latter's cost of purchasing ale which was sold in the ordinary course of the partnership's business. And if so treated it would therefore be includible in their 1948 net operating loss carryback. The second theory is based on our decisions in the so-called promoter cases of *Vincent C. Campbell*, 11 T. C. 510 (1948), and *Henry E. Sage*, 15 T. C. 299 (1950). The petitioners argue that since they, as partners, devoted their entire time and attention to the business of promoting, financing, and managing enterprises connected with the sale and distribution of beer, wine, soft drinks, and other beverages, then the manufacturing of beer was a logical extension of their existing business of distributing beverages and that when the beer business was no longer profitable they found a new product and market for both existing businesses. Hence the partnership's loss from the advances to Trenton were bad debts which resulted from the regular business carried on by the partnership. The third theory is based on our decisions in *Stuart Bart*, 21 T. C. 880 (1954), and *Tony Martin*, 25 T. C. 94 (1955). The petitioners argue that the debts resulting from the advances to Trenton by the partnership were proximately related to the beverage distribution business conducted by the partnership and were thus deductible by the partnership as business bad debts.[1]

We are of the opinion that the petitioners' position is without merit. The cases upon which they rely are clearly distinguishable from the one at hand. In *Western Wine & Liquor Co.*, *supra*, the taxpayer, a

---

[1] H. Rept. No. 2333, 77th Cong., 2d Sess., 1942-2 C. B. 431:

The question whether a debt is one, the loss from the worthlessness of which is incurred in the taxpayer's trade or business, is a question of fact in each particular case, and the determination is substantially the same as that which is made for the purpose of ascertaining whether a loss from the type of transaction covered by section 23 (e) is "incurred in trade or business" under paragraph (1) of that section. The character of the debt for this purpose is not controlled by the circumstances attending its creation or its subsequent acquisition by the taxpayer or by the use to which the borrowed funds are put by the recipient, but is to be determined rather by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt is not a nonbusiness debt for the purposes of this amendment.

wholesale liquor dealer, purchased shares of stock in the American Distilling Company in order to acquire whisky which was difficult to procure at that time due to Government restrictions on production. That company was offering bulk whisky to its stockholders in proportion to their holdings. Shortly after exercising its right to acquire the whisky the taxpayer sold the stock at a loss. We held that the loss was a part of the cost of the whisky and was not a short-term capital loss. The principle demonstrated by this case has no application in our case since there was no necessity for the partnership to advance funds to Trenton in order to acquire small bottles of ale. There was no shortage of beer or ale in 1947 or 1948 and although the acquisition of Trenton's stock in 1946 may have been for the purpose of assuring the partnership of a supply of beer at that time, the continued operation of Trenton after the beer shortage, when the advances were made, was manifestly a business venture separate and apart from the retail operation of the partnership.

The cases of *Vincent C. Campbell, supra,* and *Henry E. Sage, supra,* involved the question of whether certain worthless debts were business or nonbusiness bad debts. In *Campbell,* the taxpayers owned and operated 12 corporations engaged in the retail coal business. It was their practice as a part of their business to advance to, or leave with, those corporations on open accounts money belonging to them. The taxpayers made loans to one of the corporations which became worthless in 1944. We held that the bad debts were a direct result of, and incurred in, the taxpayer's business of organizing and operating corporations engaged in the retail coal business. In *Sage,* we found as a fact that the procedure followed by the taxpayer of investing his money in a venture and then devoting his time and energy to make it succeed was used by him with such frequency and regularity that it amounted to a regular business carried on by him. Therefore when a loan to one of his business ventures became worthless, we held that it was fully deductible by him as a business bad debt. The authority contained in the *Campbell* and *Sage* cases is applicable only to the exceptional situations where the taxpayer's activities in promoting, financing, managing, and making loans to a number of corporations have been regarded as so extensive as to constitute a business separate and distinct from the business carried on by the corporations themselves. *Charles G. Berwind,* 20 T. C. 808 (1953), affirmed per curiam 211 F. 2d 575 (C. A. 3, 1954). It is clear that they have no application here since the petitioners have failed to show that they were "promoters" as were the taxpayers in *Campbell* and *Sage.* They have not sustained the burden of proving that the advances to Trenton in 1947 and 1948 were directly a result of, and incurred in, the business of organizing and operating corporations or that their aid to Trenton

was the sort of thing that they did with such frequency and regularity that it amounted to a regular business carried on by them. Ownership of Trenton's stock does not show that operation and management of Trenton was a part of the partnership's ordinary trade or business. *Dalton* v. *Bowers*, 287 U. S. 404 (1932). And it was not necessary for the partnership to make advances in order to acquire small bottles of ale. The only reason we can see for advancing money to Trenton was to enable Trenton to produce Imp Ale and thus become a profitable enterprise once again. It is clear to us that the only business of the petitioners was the distribution of beverages at the retail level.

In *Stuart Bart, supra,* we held that a bad debt which resulted from advances by an advertising agent to a client in the course of business of assisting in the publication of a magazine was deductible by him as a business bad debt since it was proximately related to his business as an advertising agent. In *Tony Martin, supra,* the taxpayer was an entertainer who had received unfavorable publicity while serving in the Armed Forces in 1942. After being honorably discharged in 1945 the taxpayer and others organized a corporation for the purpose of producing a single motion picture starring the taxpayer. The enterprise was undertaken primarily to rehabilitate the taxpayer's career and to reestablish him in the entertainment field. In order to complete the picture it was necessary for the taxpayer and others to make certain loans to the corporation which ultimately became worthless because the picture was financially unsuccessful. We held that the taxpayer sustained a business bad debt as a result since his advances were made in connection with his business and were proximately related to the conduct of that business as the exigencies of the situation required. We think the rule of these cases is also inapplicable here. As we indicated above, the petitioners' business was that of distributing beverages at the retail level. Under the facts of this case, we fail to see how the partnership's advances to Trenton which enabled the latter corporation to brew Imp Ale are proximately related to the business of distributing beverages at the retail level. Trenton was operated as a separate entity. The price it charged the partnership for Imp Ale included a reasonable markup over cost. Operation of Trenton by the partnership was not a prerequisite for acquiring small bottles of ale. Joseph Koppelman testified that the partnership could have bought small bottles of ale from a brewery located in central Ohio. If they had done so it would have eliminated the major part of the cost of transporting ale from Trenton in Illinois, to Ohio. However, the profit derived from brewing the ale would have inured to a third person while Trenton operated at a loss. Joseph testified that in view of this they decided to let Trenton brew the ale so that in spite of the increased transportation costs, the combined

profit of both enterprises would exceed that which the partnership would make if it bought the ale from a third person. We think that the possibility of making additional profits if Trenton brewed the ale was the real reason for advancing money to Trenton. It was not to secure the particular ale brewed by Trenton since Trenton had never before brewed ale. The partnership could as well have publicized and sold the ale of a small brewery in Ohio. Upon consideration of all of the facts we believe that the advances from the partnership to Trenton were given as an aid to keep the corporation going, thus protecting the partners' capital investment in Trenton, and creating a possibility of eventually realizing gain from their investment in the Trenton stock. Therefore the advances were not made in the ordinary course of the partnership's trade or business and hence are not deductible as business bad debts. *Burnet* v. *Clark*, 287 U. S. 410 (1932); *Omaha National Bank* v. *Commissioner*, 183 F. 2d 899 (C. A. 8, 1950); *Charles G. Berwind, supra; Jan G. J. Boissevain*, 17 T. C. 325 (1951); *Estate of William P. Palmer*, 17 T. C. 702 (1951).

In summary, we hold that there were two businesses here involved, the partnership business and the corporate business. The partners, through stock ownership, controlled the corporate business. As stockholders, the partners made advances to the corporation to enable it to engage in a new venture, the manufacture of ale. On the assumption that debts were thus created, we conclude that they were nonbusiness debts, and this is true despite the fact that the partnership undertook to distribute the ale as part of its own business.

*Decisions will be entered for the respondent.*