Edna C. Haley, et al. [1] v. Commissioner. Haley v. Commissioner
Docket Nos. 53731-53733, 53820.
United States Tax Court
T.C. Memo 1959-29; 1959 Tax Ct. Memo LEXIS 220; 18 T.C.M. (CCH) 138; T.C.M. (RIA) 59029; February 12, 1959
*220 Held, certain acquisitions of shares of capital stock in a corporation by two members of a partnership were acquired by them upon behalf of a partnership; that certain advances made to the corporation were made by or upon behalf of the partnership; that such advances were nonbusiness rather than business debts; and that both the advances and investment in the capital stock of the corporation became worthless in 1949. P. A. Agelasto, Jr., Esq., Citizens Bank Building, Norfolk, Va., for the petitioners. James A. Scott, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: In these consolidated proceedings, the respondent determined deficiencies in income tax for the taxable years ending December 31 as follows: Docket
Defi-
Petitioner
No.
Year
ciency
Edna C. Haley
53731
1947
$ 2,403.78
Walter D. Haley
53732
1947
2,624.14
Walter D. Haley and
Edna C. Haley
53733
1948
16,853.38
Walter D. Haley and
Edna C. Haley
53733
1949
4,912.56
Florence Mohr
53820
1947
2,455.48
Florence Mohr
53820
1948
7,882.37
*221 The two remaining issues are: (1) whether the respondent erred in disallowing $55,889.13 in 1948 and $26,910.71 in 1949 claimed as business bad debts by a partnership in which petitioners were members, and (2) whether the capital stock of Agricade, Incorporated, became worthless in 1948, as petitioners contend, or in 1949, as determined by the respondent. Another issue relating to the deductibility by the partnership in 1947, 1948, and 1949 of travel and entertainment expenses was settled in its entirety by a stipulation, the effect of which will be given under Rule 50. Findings of Fact Some of the facts were stipulated and are so found. Petitioners Walter D. Haley and Edna C. Haley are husband and wife with residence in Norfolk, Virginia. They filed separate returns for 1947 and joint returns for 1948 and 1949 with the then collector of internal revenue for the district of Virginia at Richmond. Petitioner Florence Mohr is an individual with present residence at Irvington, New Jersey. She filed individual income tax returns for the calendar years 1947 and 1948 with the then collector of internal revenue for the district of Virginia at Richmond. During the years 1947, 1948, *222 and 1949, all three petitioners, together with Mahlon C. Mohr (husband of petitioner Florence Mohr) were equal members of a general partnership which operated under the name of Ballantine Distributing Company and is hereinafter sometimes referred to as the partnership. The partnership was entered into in the latter part of 1943 for the purpose of engaging in the business of the wholesale distribution of beer and ale. It continued to engage in that business during all of the years here involved. On or about September 28, 1945, the partnership, in addition to its beer business, entered into the conduct of an automobile sales and distribution agency at Great Neck, New York, for the purpose of carrying on a Packard automobile agency. On September 6, 1946, the partnership also entered into a business at Great Neck, New York, under the name and style of North Shore Boat Company for the purpose of carrying on the sale and distribution of boats. On January 2, 1947, A. J. Grey, H. J. Burke, and Ruth Grey organized a Virginia corporation under the name of Agricade, Incorporated (hereinafter sometimes referred to as Agricade) with an authorized capital stock of 500 shares of which 175 shares *223 were issued to the incorporators for two certain leases on a racetrack, dwelling house, and stables in Princess Anne County, Virginia. The board of directors of Agricade valued the two leases at the time they were turned in for the 175 shares of stock at a total value of $23,400. No money was paid in to Agricade by the incorporators for the 175 shares of stock. On January 30, 1947, the board of directors of Agricade approved the subscription of Mahlon C. Mohr for 75 shares of the capital stock of said corporation for the amount of $10,000 and said 75 shares were subsequently issued in February 1947. On or about May 13, 1947, Mahlon C. Mohr acquired an additional 75 shares of Agricade from the original holders thereof and on or about June 26, 1947, petitioner W. D. Haley also acquired 75 shares from the original holders. The above acquisitions of stock of Agricade by Mahlon C. Mohr and W. D. Haley were acquired by them on behalf of the partnership. The remaining 25 shares issued to the original holders of stock in Agricade were sold to E. A. Darden on or about May 17, 1947, for a cash consideration of $3,430. Darden was an engineer with Virginia Electric Power Company and became *224 interested in Agricade when he was installing the power line on the property leased by that corporation. He had no financial interest in the partnership. The partnership sold principally the products of P. Ballantine & Son, a brewery in New Jersey, near New York City. Beer was sold in large quantities to the armed forces and to the local trade such as grocery stores, clubs, hotels, and taverns. In the Norfolk, Virginia, area there were about 1,200 Virginia State retail licenses, and the partnership had about 1,190 of them as customers. The partnership did a gross beer volume of over $1,379,000 in 1947, $1,610,000 in 1948 and $1,485,000 in 1949. Agricade was originally established to conduct an annual tri-county agricultural fair which would include races, midway, carnival, exhibitions of livestock, and demonstration booths. The automobile races were to continue all season and it was the intention of the incorporators to hold three or four races a week. Frank Sheean, who had successfully managed the New York World's Fair in its second year of operation, was engaged to manage the Agricade fair. Mahlon C. Mohr was first advised of Agricade by the partnership's advertising agency *225 conducted by Stanley Gross who also represented Agricade. Gross thought Agricade would be a good media for advertising the beer being sold by the partnership. Mohr consulted his partner, Walter D. Haley. Haley did not think too much of the proposition at first but agreed to go along with Mohr providing the partnership could acquire all of the stock then held by the original incorporators of Agricade, which was done except for the 25 shares acquired by Darden. The partnership, in securing the stock control of Agricade, had plans whereby the partners thought they could sell a large quantity of beer by putting beer refreshment stands around on the grounds of the Agricade property to take care of crowds of around 10,000 people who would attend the races and other meetings of the contemplated fairs. They hoped to make from $2,000 to $3,000 a night on the sale of beer alone. Another concern had been able to do substantially the same thing at Myers Field in Norfolk where the baseball games were held and had been very successful. However, according to the regulations of the Alcoholic Beverage Control Board, one could not hold a wholesale license and sell beer at retail at the same time. *226 In order not to violate this provision of the regulations, Peter Sachon, who had been a cashier with the partnership for about 6 months, resigned his position with the partnership and in the early part of 1947 leased a building from Agricade for the purpose of operating a restaurant at which he would serve both food and beer. The partners had an oral understanding with Sachon that he would sell Ballantine beer exclusively. Sachon was quite enthusiastic about his new venture. He immediately ordered 120 cases of beer from the partnership with the intention of selling that amount on the first day of operation. He and the partnership had intentions of making Ballantine beer as popular at Agricade as Ruppert beer was at Yankee Stadium. About this time, however, several things happened that caused Sachon's restaurant to fail. A fence was placed around the fairgrounds which left the restaurant on the outside of the grounds. On or about May 5, 1947, the Alcoholic Beverage Control Board ruled that no beer refreshment stands could be set up on the fairgrounds and also that Sachon could only operate indoors instead of having a garden outside. Also, about that time Sheean (the manager of Agricade) *227 dropped dead of a heart attack while delivering a speech at Virginia Beach, and instead of having three or four races a week it turned out that only one was held on Saturdays with the result that Sachon was selling beer for only about 15 minutes a week during the intermission periods. Sachon considered his restaurant a complete failure and gave up his license to sell beer sometime in July 1947. During the entire time he operated, he sold only about 120 cases of beer. The partnership's gross profit on that amount of beer was approximately $100. Petitioner made no other sales of beer at or near the fairgrounds. In addition to the plans the partnership had for selling beer on the Agricade grounds, which did not materialize as planned, it gave to its customers many free tickets to attend the Agricade races. These free tickets numbered from 1,000 to 2,000 each week. Between February 1947 and April 29, 1947, Mahlon C. Mohr advanced a total of $10,052.92 to Agricade for the purpose of paying miscellaneous bills. This was later considered to have been made on behalf of the partnership and Mohr was refunded this amount by the partnership by means of a journal entry credit made in July 1947. *228 Between April 29, 1947, and July 29, 1947, the partnership advanced to Agricade at 25 different times a total of $49,224.98 mainly for the purpose of paying miscellaneous bills, amusement taxes, seating equipment, grading, etc. Between July 29, 1947, and December 31, 1947, the partnership advanced to Agricade at 7 different times a total of $7,365.49, mainly for grading and miscellaneous bills. During 1948, the partnership advanced to Agricade at 49 different times a total of $14,763.49, mainly for miscellaneous bills. During 1949 to and including June 21, 1949, the partnership advanced to Agricade at 71 different times a total of $18,172.80, mainly for miscellaneous bills. Of the total amount of $99,579.68 so advanced by or upon behalf of the partnership to Agricade during 1947, 1948, and 1949, Agricade repaid $2,900 in 1947, $1,931.62 in 1948, and $11,948.22 in 1949, or total repayments of $16,779.84, thus leaving a balance owing the partnership of $82,799.84. Agricade issued 12 demand notes totaling $81,709.84 for the advances made to it. Two of the notes, totaling $14,052.92, bore interest at 6 per cent. The remaining 10 notes were non-interest bearing. Darden made *229 no advances to Agricade. The business of Agricade was not the business of the partnership. The business of the partnership was not that of promoting, financing, managing, and making loans to a number of corporations. Toward the close of 1948, a firm of certified public accountants advised the members of the partnership that it was very apparent that the partnership's investment in Agricade, as well as its loans receivable from Agricade, were not worth the value which appeared on the books of the partnership. The accountants advised the partners to have an appraisal made of Agricade's assets and liabilities. An appraisal was then made by Mahlon C. Mohr and the accountants which showed that a fair value of the assets of Agricade on December 31, 1948, amounted only to $28,385.49 whereas its liabilities, exclusive of capital stock, amounted to $84,274.62. The members of the partnership then determined that its entire investment in the capital stock of Agricade in the amount of $15,000.76, and $55,889.13 ($84,274.62 minus $28,385.49) of its advancements to Agricade, were worthless. On the partnership return of income filed for the calendar year 1948, the amount of $15,000.76 was *230 shown as a long-term capital loss and the $55,889.13 was deducted as a business bad debt. The respondent, in the determination of the deficiencies for the year 1948, determined that the stock of Agricade did not become worthless until July 1949. He disallowed the deduction of $55,889.13 claimed by the partnership as a business bad debt and held that the advances to Agricade were contributions of capital rather than loans and as such constituted additional cost of the stock. On June 13, 1949, Agricade was adjudged a bankrupt. On April 23, 1951, the partnership paid to the trustee in bankruptcy for Agricade the sum of $3,802.58 in settlement of a claim asserted by the trustee to recover a voidable preference alleged to have been received by the partnership when Agricade repaid to the partnership on June 1, 1949, the sum of $8,881.52 (included in the previously mentioned repayments in 1949 of $11,948.22) within 4 months of bankruptcy. On the partnership return of income filed for the calendar year 1949, the partnership deducted the balance of the amount owing it by Agricade of $26,910.71 ($82,799.84 minus $55,889.13) as a business bad debt. In determining the deficiency for *231 the year 1949, the respondent disallowed the deduction of $26,910.71 claimed by the partnership as a business bad debt and held that the advances to Agricade were contributions of capital and, as such, constituted additional cost of the stock. He further determined that the stock of Agricade became worthless in July 1949 and that the partnership then sustained a long-term capital loss of $101,603.12 made up of the following items: Original cost of capital stock
$ 15,000.76
Capital contributions: Amount claimed as business
bad debt in 1948
55,889.13
Amount claimed as business
bad debt in 1949
26,910.71
Account receivable balance due
from Agricade for refund
made to receiver
3,802.52
Total
$101,603.12
The advances to Agricade in the total amount of $99,579.68 constituted loans rather than capital contributions made by or upon behalf of the partnership and no part thereof constituted the personal loans or contributions of capital of Mahlon C. Mohr. Such loans, together with the partnership's investment in the capital stock of Agricade, became worthless in the year 1949. The relation which the loss resulting from the loans' becoming worthless in 1949 bears *232 to the partnership's trade or business was not a proximate one in the conduct of the trade or business in which the partnership was engaged at the time the loans became worthless. Such loans made by or upon behalf of the partnership were "non-business debts" as that term is used in section 23(k)(4) of the Internal Revenue Code of 1939. Opinion The issues remaining for our decision are all questions of fact which must be determined from the evidence received in these proceedings. The respondent first contends that most of the advances to Agricade were made individually by Mahlon C. Mohr and that the 225 shares of capital stock of Agricade were acquired individually by Mohr and Walter D. Haley. The evidence does not show such to be the fact. Both Mohr and Walter D. Haley. The evidence does not show such to be the fact. Both Mohr and Haley testified that the stock was acquired for the partnership and that all the advances were made on behalf of the partnership and we have so found. The respondent determined that the advances were contributions of capital. He now requests us to find that they were either contributions of capital or nonbusiness bad debts. We have found that the advances *233 constituted loans rather than contributions of capital even though it may well be that toward the end petitioners were sending good money after bad. Notes were given for most of the advances and a debtor-creditor relationship was established. No advances were made by Darden who held 10 per cent of the outstanding stock of Agricade. Whether the loss from the worthlessness of the loans is deductible as a business bad debt under section 23(k)(1) of the Internal Revenue Code of 1939, or as a nonbusiness bad debt under section 23(k)(4) thereof [2] is a question of fact. Dominick J. Salomone, 27 T.C. 663, 669; Hickerson v. Commissioner, 229 Fed. (2d) 631 (C.A. 2, 1956), affirming a Memorandum Opinion of this Court [13 TCM 1180; T.C. Memo. 1954-237]; Gulledge v. Commissioner, 249 Fed. (2d) 225 (C.A. 4, 1957), affirming a Memorandum Opinion of this Court [16 TCM 134; (M); T.C. Memo. 1957-29]; S. D. Ferguson, 28 T.C. 432, affd. (C.A. 4, Mar. 6, 1958) 253 Fed. (2d) 403; Darwin O. Nichols, 29 T.C. 1140, 1145. See also H. Rept. No. 2333, 77th Cong., 1st Sess. *234 , 1942-2 C.B. 372, 431. [3]
*235 It may be noted from the above-mentioned statute and the Committee Report that if the debts here in question were nonbusiness debts, then the loss would be sustained only when the debt became totally worthless and no partial chargeoff thereof would be permissible. Petitioners do not contend that the partnership was in the business of promoting, organizing, or managing financial business enterprises so as to come within the scope of the so-called promoter cases, such as Henry E. Sage, 15 T.C. 299; Vincent C. Campbell, 11 T.C. 510; and Langdon L. Skarda, 27 T.C. 137, 148, affd. 250 Fed. (2d) 429 (C.A. 10, 1957). In any event, the evidence would not support such a contention. Cf. Charles G. Berwind, 20 T.C. 808, affd. per curiam, 211 Fed. (2d) 575 (C.A. 3, 1954). In Jan G. J. Boissevain, 17 T.C. 325, we recognized as a statutory requirement "that the year of the loss is the year in which must exist the proximate relation of the loss to the taxpayer's business in that year." If petitioners are to prevail in the instant case, the evidence in the record must show that at the end of 1948 when *236 the partial chargeoff was made and in 1949 when the remainder of the advances were charged off, the relation which the loss resulting from the debts' becoming worthless bore to the trade or business of the partnership was a "proximate" one. Sec. 29.23(k)-6, Regulations 111; Jan G. J. Boissevain, supra. We think the evidence shows quite conclusively that there is no merit in petitioners' contention of proximate relationship of the worthless debts in question to the beer distributing business of the partnership. It seems to us that these advances of over 150 separate items were advances of money to finance the operations of a racetrack and fairgrounds by Agricade rather than to promote any business carried on by the partnership. The partnership was in the beer distributing business and not in the business of running a racetrack or conducting fairs. It may be true that at one time the partners had some fanciful hopes of selling considerable beer on the grounds of Agricade through a former employee of the partnership, but all such hopes completely disappeared by July 1947. As we have found, very little beer was sold, viz., 120 cases, on which the partnership grossed approximately *237 $100. In his brief the respondent says "Such a return hardly bespeaks of business promotion outlays of approximately $100,000 most of which, as previously shown, were made after it was known that beer sales were not in the offing." We agree. The same observations may be made relative to any benefit the partnership may have hoped to derive from the distribution to its customers of the free tickets to the races. We find that the advances in question were made principally to pay for the running expenses of Agricade and not for the promotion of the partnership's beer business. In Edward Koppelman, 27 T.C. 382, appeal dismissed pursuant to stipulation (C.A. 6, 1957), 249 Fed. (2d) 442, partners in the wholesale beer distribution business acquired stock ownership of a corporation which operated a brewery in order to provide the partnership with an adequate supply of beer since during that year there was a short supply of beer because of a grain shortage in 1946. In 1947, when there was no longer a shortage in the supply of beer, the brewery lost money and the partnership advanced money to enable the brewery to brew ale in small bottles for sale by the partnership. *238 In denying business bad debt deductions for the losses claimed on the advances, we said, in part: "As we indicated above, the petitioners' business was that of distributing beverages at the retail level. Under the facts of this case, we fail to see how the partnership's advances to Trenton which enabled the latter corporation to brew Imp Ale are proximately related to the business of distributing beverages at the retail level. Trenton was operated as a separate entity. The price it charged the partnership for Imp Ale included a reasonable markup over cost. Operation of Trenton by the partnership was not a prerequisite for acquiring small bottles of ale. * * * Upon consideration of all of the facts we believe that the advances from the partnership to Trenton were given as an aid to keep the corporation going, thus protecting the partners' capital investment in Trenton, and creating a possibility of eventually realizing gain from their investment in the Trenton stock. * * *" We do not think the evidence in the instant case offered for the purpose of showing a close proximity of the losses in question to the beer distributing business of the partnership is as strong as was the evidence *239 in the Koppelman case, supra. Petitioners rely primarily upon our decision in Tony Martin, 25 T.C. 94, and the jury verdict in the case of Mohr v. United States (Sept. 24, 1956), tried in the United States District Court, E. Dist. of Va., and reported in, 51 AFTR 1592. The evidence in the Martin case showed that the loans made by Martin to a corporation organized by him were for the purpose of rehabilitating his career and reestablishing himself in the entertainment field. In the instant case, the loans to Agricade had no substantial relationship to the beer distribution business of the partnership. Perhaps a word should be said at this point about the motion of petitioners' counsel to plead collateral estoppel by judgment by reason of the jury verdict in the case of Mohr v. United States, supra. Inasmuch as the parties have now filed a stipulation settling one of the principal issues in these proceedings and no further mention was made on brief of the motion, we assume it needs no further comment. Petitioners' argument that we should accept the District Court's decision that the loans were business in character, we think is without merit. We do not *240 know what the evidence was in the District Court case but, on the record before us, we have no hesitancy in reaching a contrary conclusion. Petitioners also contend that the capital stock of Agricade became worthless during the year 1948. The partnership's expressed confidence in at least a potential value for the stock by making in excess of $18,000 in further advances to Agricade in 1949 reasons against their argument. The identifiable event of bankruptcy which took place in 1949, we think, on this record marked the year of worthlessness. George P. Sacks, 25 B.T.A. 415, affd. (C.A. 4, 1933) 66 Fed. (2d) 308. We hold that the shares of capital stock in Agricade acquired by Mahlon C. Mohr and Walter D. Haley were acquired by them upon behalf of the partnership; that all the advances to Agricade were made by or upon behalf of the partnership; that such advances were nonbusiness debts rather than business debts; and that both the advances and the investment in the capital stock of Agricade became worthless in 1949. The individual incomes of the petitioners should be redetermined in accordance with such holdings and in accordance with the stipulation previously *241 mentioned. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Walter D. Haley, Docket No. 53732; Walter D. Haley and Edna C. Haley, Docket No. 53733; and Florence Mohr, Docket No. 53820.↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * * This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection. * * *
(4) Non-business debts. - In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. ↩
3. "A new provision is added providing for special treatment of nonbusiness debts, applicable in the case of a taxpayer other than a corporation. * * * The provisions of section 23(k)(1), as amended by this section, with respect to a debt which has become partially worthless, do not apply in the case of a non-business debt; and a loss with respect to such a debt will be treated as sustained only if and when the debt has become totally worthless. * * * The question whether a debt is one, the loss from the worthlessness of which is incurred in the taxpayer's trade or business, is a question of fact in each particular case, and the determination is substantially the same as that which is made for the purpose of ascertaining whether a loss from the type of transaction covered by section 23(e)↩ is "incurred in trade or business" under paragraph (1) of that section. The character of the debt for this purpose is not controlled by the circumstances attending its creation or its subsequent acquisition by the taxpayer or by the use to which the borrowed funds are put by the recipient, but is to be determined rather by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt is not a non-business debt for the purposes of this amendment."