42

WILFRED J. FUNK AND ELEANOR M. FUNK, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 70665.    Filed October 13, 1960.

*George A. Donohue, Esq.,* and *Elden McFarland, Esq.,* for the petitioners.

*A. Jesse Duke, Jr., Esq.,* for the respondent.

OPINION.

RAUM, *Judge:* Petitioner presently contends that he is entitled to a business bad debt deduction for 1953 in the amount of $136,946.86, consisting of three separate items or groups of items, all of them involving loans or advances previously made by him to Wilfred Funk,

Inc.[1] That petitioner incurred these losses in 1953 is uncontroverted, the only issue being whether they are deductible in full as business bad debts, as claimed by him, or whether the deduction of one or more of the component items is limited by statute, as a loss on a registered security, nonbusiness bad debt or capital loss.

1. The first item in controversy grows out of a series of advances made by petitioner to Wilfred Funk, Inc., from time to time during 1940, 1941, and 1942. These advances were evidenced by promissory notes, which were consolidated into a single promissory note in the face amount of $100,000, dated December 15, 1942. Subsequent payments on that note had reduced the amount of the debt to $62,148.11. However, we must agree with the Commissioner that any deduction based upon this item is limited by the provisions of section 23(k)(2) of the 1939 Code [2] relating to worthless "securities," since the note in controversy is, in our judgment, a "security" within the meaning of section 23(k)(3).[2] The note, by its terms, was transferable on the books of the corporation, and specifically referred to the holder as "the registered holder"; it was thus in "registered form," thereby falling precisely within the definition of "securities" contained in section 23(k)(3). Cf. *Carl Oestreicher*, 20 T.C. 12.

Petitioner's contention that the reasons for casting the note in registered form in 1942 had ceased to exist by 1953 is beside the point. The fact is that the form of the note remained the same, and, whether petitioner desired it or not, the provision in the note relating to transferability on the books of the company continued "to protect the holder by making invalid unregistered transfers." *Gerard* v. *Helvering*, 120 F. 2d 235, 236 (C.A. 2). We hold that the Commissioner properly disallowed a business bad debt deduction with respect to this note.

---

[1] The three components are as follows: (a) $62,148.11 representing the unpaid portion of a $100,000 note; (b) five advances evidenced by promissory notes aggregating $32,500, which were made between October 27, 1949, and October 24, 1950; and (c) advances on open account from July 29, 1952, and July 3, 1953, aggregating $55,000. In satisfaction of his claim of $149,648.11, the sum of the foregoing items, petitioner received $11,201.25 in cash and the assignment of a copyright worth $1,500, thus sustaining a loss of $136,946.86. However, in his return petitioner claimed a deduction of $138,447.31. The difference, $1,500.45, is accounted for in large part by the copyright assignment; the remaining 45 cents is unexplained.

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
  In computing net income there shall be allowed as deductions:
  *    *    *    *    *    *    *
  (k) BAD DEBTS.—
  *    *    *    *    *    *    *
  (2) SECURITIES BECOMING WORTHLESS.—If any securities (as defined in paragraph (3) of this subsection) become worthless within the taxable year and are capital assets, the loss resulting therefrom shall * * * be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets.
  (3) DEFINITION OF SECURITIES.—As used in paragraphs (1), (2), and (4) of this subsection the term "securities" means bonds, debentures, *notes,* or certificates, or other evidences of indebtedness, issued by any corporation * * * with interest coupons or *in registered form.* [Emphasis supplied.]

2. Petitioner challenges the Commissioner's treatment of the $32,500 notes as nonbusiness bad debts on two grounds. He contends that they represented business loans because they were proximately related (a) to his business of organizing, financing, and managing corporations operating in the publishing field, of which Wilfred Funk, Inc., was one; and (b) to his professional occupation as a writer.

The first reason appears to be of doubtful merit. It seems unlikely to us on the evidence that petitioner's relationship to the seven corporations (some of which represented merely different phases of the same venture) could constitute the conduct of a business of organizing, financing, and managing corporations. Cf. *Phil L. Hudson*, 31 T.C. 574; *H. Beale Rollins*, 32 T.C. 604, affirmed 276 F. 2d 368 (C.A. 4). However, we need not pass upon this point because we think petitioner's second reason is sound.

There is no dispute between the parties that petitioner was a professional writer, but the Government argues that the advances in question were not proximately related to his occupation as a writer. It denies petitioner's claim that the assurance of a publishing outlet and the promotion of his reputation as a writer constituted one of the principal reasons for the organization of Wilfred Funk, Inc., and it points to evidence showing that during the period 1940 through 1953 the corporation paid or accrued royalties to authors of $257,483.49 of which only $53,315.70 was paid to petitioner. Although there is force to the Government's position, we think that the weight of the evidence tips the scales the other way.

We may readily agree with the Government that one of the purposes of establishing and operating Wilfred Funk, Inc., was to create and utilize a vehicle for engaging in the publishing business, a business that cannot be attributed to petitioner in view of the corporate entity. See *Phil L. Hudson*, 31 T.C. at 583, and cases cited. But, on the evidence, we also agree with petitioner that another, and important purpose was to provide him with a ready publishing outlet for his own works and to enhance and exploit his reputation as a writer. The mere fact that the corporation published the works of a number of other authors does not at all detract from the substantial part that it was intended to play and in fact did play in the promotion of petitioner as a writer. Moreover, the use of his own name in the corporate title, even when publishing the works of other authors, was a means of keeping his name before the public to assist in the acceptance and sale of his own books. And had Wilfred Funk, Inc., failed financially, petitioner felt it would be a serious blow to his professional reputation and prestige. In the circumstances we hold that the $32,500 notes formed the basis for business bad debts. Cf. *Tony Martin*, 25 T.C. 94; *J. T. Dorminey*, 26 T.C. 940; *Mac Levine*, 31 T.C. 1121.

3. The final series of advances, made on open account in 1952 and 1953 totaling $55,000, stands on a different footing. The Commissioner determined that these advances did not represent true loans but were in reality risk capital. We think the evidence supports that position.

By July 29, 1952, when the first advance of this third group was made, the financial condition of Wilfred Funk, Inc., had substantially deteriorated. Beginning in 1948, Wilfred Funk, Inc., had been incurring annual losses continuously in its operation. In 1950 the net operating loss was $30,874.47, in 1951 it was $51,621.66, and in 1952 it was $61,069.76. At the beginning of 1952 the deficit in surplus had already sunk to $101,205.10 and at the end of that year it had worsened to a deficit of $162,014.46. It is apparent that by the time this third group of advances was made, from July 29, 1952, to July 3, 1953, Wilfred Funk, Inc., was already in the ever-tightening grips of insolvency. Advances made under such rapidly declining financial conditions could hardly have been made with a reasonable expectation of repayment, apart from the gamble based upon possible future corporate earnings.

What we said in *Phil L. Hudson*, 31 T.C. 574, is peculiarly applicable here (p. 583):

Whether petitioner's advances to [Wilfred Funk, Inc.] represented genuine loans rather than risk capital is open to serious question. The need for his advances was largely attributable to [Wilfred Funk, Inc.'s] severe lack of working capital. No notes or other evidences of indebtedness were issued in respect of these advances * * *. It seems highly persuasive that the expectation of repayment was based only upon possible future earnings; and that petitioner was satisfied to let his money ride with the ups and downs of the venture, hoping that the [publishing] business would become profitable and that he would some day reap the fruits of a successful investment. These circumstances strongly suggest that the advances were intended as risk capital rather than loans, * * *

We conclude that a bad debt deduction in respect of the $55,000 advances here in controversy was properly disallowed. Cf. *Fred A. Bihlmaier*, 17 T.C. 620.

*Decision will be entered under Rule 50.*