Ellsworth C. ALVORD and Katharyn W. Alvord, Husband and Wife, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 7984.

United States Court of Appeals Fourth Circuit.

Argued Jan. 7, 1960.

Decided April 26, 1960.

Harry L. Brown, Washington, D. C. (Ellsworth C. Alvord, Alvord & Alvord, Washington, D. C., and Noel T. Dowling, New York City, on brief), for petitioners.

Carter Bledsoe, Attorney, Department of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., and Lee A. Jackson and Grant W. Wiprud, Attorneys, Department of Justice, Washington, D. C., on brief), for respondent.

Before SOPER, HAYNSWORTH and BOREMAN, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The question is whether a citizen of the United States, who owns a majority of the stock of a foreign personal holding company, is taxable under § 337 of the 1939 Code[1] on his share of the undistributed net income of the corporation during years in which the United States effectively prohibited the distribution of such income. In holding that he was,[2] we think the Tax Court adopted a too literal and an erroneous interpretation of the statute.

Brief reference to the background, fully set forth in the opinion of the Tax Court, is necessary to an understanding of the context in which the question arises.

*Background—The Patenotres*

Eleanor and Raymond Patenotre, mother and son, were citizens of France owning substantial assets in this country. At the critical times, most of these assets were held by J. P. Morgan & Co. in an agency account or under certain escrow agreements which the Patenotres executed to secure payment of their United States income tax obligations. In addition, E. F. Hutton & Co., held in New York the assets, principally securities, of Hekor Investment Holding Company, Ltd., a Canadian corporation, and Raymond Patenotre was the owner of 95% of Hekor's outstanding stock.[3] Hekor's assets and Raymond Patenotre's Hekor stock were also involved in arrangements effected in 1949 to secure payment of the Patenotre tax obligations.

In 1943, there was a jeopardy assessment of income tax, penalties and interest claimed to be due by Eleanor Patenotre for the calendar year 1930 in the aggregate amount of $2,836,961.43. Thereafter, from time to time, deficiencies of income tax, with penalties and interest, for succeeding years were asserted against Eleanor and, in later years, against Raymond Patenotre.

In 1947, the Patenotres came to the United States. Under applicable regula-

1. 26 U.S.C.A. § 337. In pertinent part, that section provides:

"Corporation income taxed to United States shareholders

"(a) General rule. The undistributed Supplement P net income of a foreign personal holding company shall be included in the gross income of the citizens or residents of the United States, domestic corporations, domestic partnerships, and estates or trusts (other than estates or trusts the gross income of which under this chapter includes only income from sources within the United States), who are shareholders in such foreign personal holding company (hereinafter called 'United States shareholders') in the manner and to the extent set forth in this Supplement.

"(b) Amount included in gross income. Each United States shareholder, who was a shareholder on the day in the taxable year of the company which was the last day on which a United States group (as defined in section 331(a) (2)) existed with respect to the company, shall include in his gross income, as a dividend, for the taxable year in which or with which the taxable year of the company ends, the amount he would have received as a dividend if on such last day there had been distributed by the company, and received by the shareholders, an amount which bears the same ratio to the undistributed Supplement P net income of the company for the taxable year as the portion of such taxable year up to and including such last day bears to the entire taxable year.

"* * * *"

Section 337 of the Internal Revenue Code of 1939 was adopted in the Internal Revenue Code of 1954 as § 551, 26 U.S.C.A. § 551 in substantially the same form.

2. 32 T.C. 1.

3. The remaining 5% of Hekor's outstanding stock was owned by Pierre du Pasquier, another citizen of France.

tions, they were not allowed to depart from the United States until they had paid all of their tax obligations to the United States or made arrangements, satisfactory to the United States, for their payment. In October 1949, an arrangement was effected through the Chief of the Alien Tax Division of the Bureau of Internal Revenue under which, (1) Eleanor's liabilities for income taxes for 1930, including penalties and interest, were settled by the payment of $2,000,000 out of the Morgan & Co. agency account, (2) though tax liens had been filed with both Morgan & Co. and Hutton & Co., the Patenotres were permitted to withdraw $500,000 from the agency account at Morgan & Co., (3) after paying the two items aggregating $2,500,000, Morgan & Co. was to hold the remaining Patenotre assets in its possession under an escrow agreement directing and obligating it to apply those assets in payment of the Patenotre tax liabilities for the years 1931–1949 when those tax liabilities were finally determined, and (4) Raymond Patenotre executed an assignment to the District Collector of all of his interest in the stock of Hekor and in Hekor's assets as additional security for the payment of the 1931–1949 tax liabilities of the Patenotres.

When these security arrangements were effected in 1949, the claims, actual and in contemplation, of the United States against the Patenotres for taxes, penalties and interest for the years 1931–1948 aggregated approximately $3,023,000.[4] At that time the Patenotres filed tentative returns for 1949. Raymond reported a 1949 tax liability of approximately $21,000 which he attempted to pay with a check on Morgan & Co. Morgan would not honor the check, however, because of the still outstanding tax lien of which it had notice. Later a deficiency for 1949 in the amount of $85,000 with a penalty addition of $21,000 was asserted against Eleanor. As finally determined Eleanor's tax liability for

1949 was $56,105.83 and Raymond's $2,972.65.

In 1950, these tax claims were substantially increased. By an amended answer in a pending proceeding in the Tax Court involving Raymond's income tax liabilities for the years 1934–1940, the Commissioner increased his claim of deficiencies of tax and penalties from $324,789.48 to $1,267,167.01. The tax claims for the years 1931–1949, however, were known to be inflated, for income items totalling approximately $2,700,000 had been charged to both Eleanor and Raymond, and taxes thereon had been assessed to each of them.

Raymond Patenotre died in 1951, and thereafter estate tax liabilities were asserted as well as accruing liabilities for income taxes for the years 1950–1953. As finally determined in 1955, however, there was no estate tax liability and the income tax liabilities for the years 1950–1953 were relatively small and inconsequential.

In November 1955 a settlement of all of the Patenotre tax liabilities was agreed upon. This resulted in the termination of pending Tax Court proceedings by stipulation and an administrative determination of the income tax deficiencies for years not before the Tax Court. For the years 1931 through 1953 the unpaid income tax liabilities of Eleanor, Raymond and Raymond's estate, thus determined, aggregated $1,287,266.53. Of that amount $1,210,021.57 was attributable to the years 1931–1948; $52,654.65 to the year 1949 and $18,166.48 to the years 1950–1953. There were also penalty additions with respect to the years before the Tax Court of $269,108.07.

With interest on the deficiency for each year, the settlement required a total payment of $2,343,843.52. An advance payment of $2,200,000 had been made out of the account at Morgan & Co. in December 1954. The balance of $143,843.52, which included interest to the

4. This does not include Eleanor's liability for 1930 which had then been finally settled by the payment of $2,000,000.

date of payment, was paid out of the same account on November 30, 1955. Thereupon, the escrow agreement under which Morgan had held the Patenotre assets since 1949, the assignment of the Hekor stock and assets and all notices of tax liens were cancelled.

### The Taxpayer and the Hekor Stock

The taxpayer, Ellsworth C. Alvord, is a practicing attorney in Washington, D.C. He had represented the Patenotres and had advanced funds to them. Early in 1949, Raymond acknowledged that he was indebted to Alvord, on account of such services and advances, in an amount approaching $700,000. He agreed to pledge his Hekor stock to secure this indebtedness. This pledge, apparently, was not effected, or it was released, for the stock was subsequently assigned to the District Collector as additional security for the payment of the Patenotre tax obligations.

Later in 1949, however, after the security arrangements for payment of the Patenotre tax liabilities had been effected, Patenotre agreed to sell his Hekor stock to Alvord for which Alvord was to cancel the Patenotre indebtedness to him and to pay $475,000 [5] in cash. Patenotre agreed to obtain a release of the Hekor stock and the assets of that company from the claims of the United States. Promptly after that was accomplished, final settlement was to be had.

Though the cash portion of the purchase price was not paid until 1956 and though the assignments to the District Collector and the tax liens were in effect until late 1955, it is agreed that Alvord became the owner of Patenotre's Hekor stock in September 1951. Thereafter, he was the owner of 9,500, or 95%, of the 10,000 shares of Hekor stock outstanding.

When Alvord acquired the Hekor stock, and thereafter until November 1955, the United States had control, and was in active charge, of Hekor's assets and its financial affairs. It was exercising these powers under Patenotre's assignment and its tax lien. Without the permission of the United States, Hekor's directors were without power to declare and pay a dividend to the stockholders.

In November 1951, Alvord requested permission to declare and pay at the end of the year a dividend in the amount of Hekor's estimated "Supplement P net income." [6] This request was refused by the Chief of the Alien Tax Division upon the grounds that (1) the Hekor stock had been assigned to the United States as security for the income tax liabilities of the Patenotres for the years 1931–1949; (2) Hekor, itself, had substantial unpaid tax obligations, and (3) Raymond Patenotre having died, there probably would be substantial estate taxes for which the United States had a statutory lien upon Raymond's assets (presumably the 9,500 shares of Hekor's stock).

Alvord responded contentiously, but he made the point that the tax claims against the Patenotres were substantially less than the value of the assets held in escrow by Morgan for their payment,[7] and he "assumed" that the denial

---

5. At the time of final settlement, in 1956, this was increased to $800,000.
6. The reference is to the basis of taxation to American stockholders of undistributed net income of foreign personal holding companies in their control. See 1939 Code, §§ 336, 337.
7. He dismissed the estate tax claims in cavalier fashion. Indeed, nothing was allocated to them in the final settlement.
   In late 1951 the fair market value of the assets in escrow at Morgan & Co. exceeded $3,750,000; in late 1953, $3,800,000, and, after paying out $2,200,-

000 in December 1954 to be applied upon the Patenotre tax obligations, there were still assets having a fair market value of $1,984,532.20 in that account at the end of 1954. As finally determined in 1955, the unpaid portion, including interest accrued to November 30, 1955, of the Patenotre obligations amounted to only $143,843.52. In late 1951 and late 1953 Hekor's assets had a fair market value in excess of $2,000,000, and at the end of 1954 those assets had a fair market value of $3,223,108. From these figures, it is apparent that payment of the Patenotre tax obligations was abundantly secured.

of his request relieved him of any obligation to report on his individual return his share of Hekor's undistributed Supplement P net income.

In 1952, there was a stipulation pursuant to which Hekor paid, subject to redetermination, $128,700.67 on account of deficiencies of income tax, personal holding company surtax and penalties. On motion made in 1956, it was determined that this payment resulted in an overpayment of $101,636.66. In 1952, however, interest amounting to some $68,000 had been paid upon the conditionally determined deficiencies asserted against Hekor. This interest payment, with other deductions, left Hekor with no Supplement P net income for 1952.

In November 1953, Hekor's Board of Directors declared a dividend in an amount equal to Hekor's undistributed Supplement P net income for that year, subject, however, to the approval of the District Director of Internal Revenue. Letters were addressed to that official and to the Chief of the Alien Tax Division requesting permission to pay the declared dividend. In these letters, Alvord made reference to the amount of the tax claims against the Patenotres and Hekor, the security which had been provided for the payment of those claims and to the unfairness which would result if he, individually, was required to report, and pay tax upon, his share of Hekor's Supplement P net income if he was not allowed to make a distribution of it.

This request was denied by reference to the denial of a similar request for permission to pay out 1951 earnings as dividends.

Yet another request in 1954 for permission to pay out the Supplement P net income, reinforced by reference to the amount of the settlement value of the Patenotre tax claims, then under consideration, was refused upon the ground that the duration of the settlement negotiations could not be predicted.

### The Controversy

These circumstances led to the assertion against Alvord of personal income tax deficiencies for 1951, 1953 and 1954, based upon additions to his income of 95% (his proportionate part of the outstanding stock of Hekor) of Hekor's Supplement P net income for those years. If these additions are correctly asserted, his income tax liabilities, without interest, will approximate his disposable income for the years in question.[8]

The question which faces us, then, is whether Congress intended to tax an American shareholder of a foreign personal holding company as if he had received a dividend in an amount equal to his proportionate part of the company's current earnings when the United States through its Internal Revenue Service, in control of the financial affairs of the company, refuses to permit the

This is not to imply criticism of tax officials who are reluctant to release any part of the security when the amount of the Patenotre tax obligations was uncertain. It does suggest that when Alvord acquired the Hekor stock he might reasonably have supposed that tax officials, who had permitted the Patenotres to withdraw from Morgan & Co. $500,000 for their own use, would permit withdrawals of current earnings from Hekor, particularly, when a large proportion of such withdrawals would be recovered through additional tax liabilities imposed upon Alvord.

| | 1951 | 1953 | 1954 |
|---|---|---|---|
| 8. Net disposable income | $153,053.34 | $139,204.33 | $140,639.02 |
| Tax thereon | 94,683.58 | 87,610.68 | 83,124.08 |
| Net after taxes | $ 58,369.76 | $ 51,593.65 | $ 57,514.94 |
| Tax addition based upon Hekor's Supp. P net income | 50,081.94 | 53,571.60 | 59,735.22 |
| | $ 8,287.82 | ($ 1,977.95) | ($ 2,220.28) |

payment of such a dividend.[9] The answer need not be sought alone in the language of the statute, for its setting in the history of the development of our tax laws and the purpose Congress sought to serve by its enactment bear importantly upon the meaning of the language of the statute.[10]

Prior to 1937, many citizens and residents of the United States, seeking to escape taxes, organized foreign personal holding companies to which they transferred securities and properties. Since the holding company was beyond the jurisdiction of the United States and the reach of her revenue laws, income could be received and accumulated by the holding company without being subjected to income taxes of the United States. Only to the extent that dividends were actually declared and paid were income tax liabilities imposed upon United States shareholders.

In a message to Congress, President Roosevelt asked for legislation which would make the "tax structure evasion proof." He referred specifically to the employment of foreign personal holding corporations as a device for tax evasion. The Congress created a "Joint Committee on Tax Evasion and Avoidance" which held hearings, as did the House Ways and Means Committee. There followed recommendations which led to the enactment of the Revenue Act of 1937, including Supplement P.[11]

The attention of the Congress was centered upon the individual or family employing a foreign personal holding company to insulate current income of income producing properties from United States taxes. This was accomplished by permitting the income of the holding company to accumulate and avoiding taxable dividend distributions. The scheme of § 337, appropriate to the purpose, is that, whether the holding company pays out its current earnings in dividends, the United States shareholder is taxed as if it had. The effect of the statute, of course, is to force the controlling United States shareholders to procure annual distributions of all of the Supplement P net income of the holding company.

Indeed, achievement of this effect, annual distributions in dividends of holding company net income, was the immediate purpose of the statute. Failure to make such distributions was the evil at which it was directed. Moreover, since the pressure of the tax could be exerted only upon United States shareholders, the statute was made inapplicable in situations in which the United States shareholders might be powerless to accomplish the desired distributions.

Thus, by definition,[12] the statute is made inapplicable if more than half of

---

9. A different question might be presented if the prohibition of the United States was only temporary. If in a succeeding year, not too distant, distributions of such earnings were permitted and were not treated as ordinary income fully taxable to the American shareholders in the year of their receipt, the only detriment to the shareholder would be the interest cost imposed upon him when required to pay taxes in one year upon income actually received in a subsequent year. Under § 337(e) and (f) undistributed Supplement P net income taxed proportionately to American shareholders, may be treated by the company as an additional contribution to capital by the shareholders and added proportionately by the American shareholders to the bases of their stock. Such treatment does not reduce the amount of previously accumulated earnings, however, and any subsequent distribution must be first charged to those accumulated earnings. Hekor had accumulated earnings for previous years. Any attempt by Alvord to reimburse himself in a subsequent year for taxable income he was not permitted to receive in 1951, 1953 and 1954 would result in the receipt by him of ordinary income fully taxable in the year of receipt.

10. United States v. Monia, 317 U.S. 424, 432, 63 S.Ct. 409, 87 L.Ed. 376; Marsman v. Commissioner, 4 Cir., 205 F.2d 335; Crosse & Blackwell Company v. F.T.C., 4 Cir., 262 F.2d 600, 603.

11. See generally, Paul, "The Background of the Revenue Act of 1937," 5 University of Chicago Law Review 41, 44–53.

12. 26 U.S.C.A. § 331(a) (2).

... the outstanding shares are not owned by a "United States group" consisting of not more than five individuals. Not unreasonably, it was supposed that so small a group of individuals, with identical interests because of the force of the statute, would be sufficiently cohesive that it could, and would, procure the desired annual distribution of the earnings of the holding company. A larger group or one owning less than a majority of the stock of the holding company might be powerless to accomplish the intended result; in that event, obviously for that reason, the statute was made inapplicable. The compulsive force of the tax on the shareholders is exerted when its pressures can be expected to induce action in compliance with the statute's objective, but other shareholders are not subjected to pressures to do what they cannot command.

Judge Learned Hand said recently:[13]

"*  *  *  (I)t is a commonplace that a literal interpretation of the words of a statute is not always a safe guide to its meaning. Indeed, in extreme situations this doctrine has been carried so far that language inescapably covering the occasion has been disregarded when it defeats the manifest purpose of the statute as a whole. Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226; Markham v. Cabell, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165; Cawley v. United States, 2 Cir., 1959, 272 F.2d 443. We need not go so far in the case at bar. *  *  * "

■ Nor need we here go so far. In the light of the purpose of the statute, the evil at which it was directed and the revealing limitations of § 331(a) (2), we think that Congress intended the words "undistributed Supplement P net income," the measure of the tax upon the shareholders, to mean such income as was undistributed because of inaction of the "United States group." At least, it seems plain that it was not intended that those words should include income which was undistributed because the United States, through its Internal Revenue Service, exerted its power to prevent the act the statute was designed to compel.

In a different context, this court refused to adopt a literal interpretation of this statute without regard to its purpose or the extraordinary result to which it would lead.[14] There Judge Soper reviewed the history and purpose of the statute and adopted a construction which seemed more consistent with the evident congressional purpose than the extreme interpretation which the Commissioner had adopted. For the reasons expressed there, we come to a similar conclusion here.

■ We need not now consider what the result might be if the failure to distribute all of the earnings of the foreign holding company was caused or influenced by restraints of private agreements or the laws or regulations of foreign governments. Such a situation was considered in Eder v. Commissioner, 2 Cir., 138 F.2d 27. There a Colombian corporation declared and paid dividends in pesos only to the extent it was permitted by exchange regulations to export pesos for conversion into dollars. There was nothing to prevent a distribution of the remainder of its earnings in blocked pesos. The court held the American shareholders were taxable on the undistributed earnings since they could have been distributed in blocked pesos, but the measure of the tax, it held, was to be determined not by the exchange rate of free pesos but by the economic advantage the taxpayers could have derived from receipt of the blocked pesos.

If the economic advantage which the shareholders could have appropriated for themselves, but did not, be the measure of the tax, the taxpayer here could not

---

13. Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 2 Cir., 274 F.2d 487, 489.

14. Marsman v. Commissioner, 4 Cir., 205 F.2d 335.

720

appropriate to himself any economic advantage, for the United States effectively prohibited it.

We think that under the statute, properly construed, Hekor had no "undistributed Supplement P net income" taxable to its United States shareholder during the years in question. In our view, the statute does not tax Alvord as if he had received what the United States withheld from him.

Reversed.

Waterman, Circuit Judge, dissented.