**GARLOCK, INC., Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 60, Docket 72-2108.

United States Court of Appeals, Second Circuit.

Argued Oct. 24, 1973.

Decided Dec. 12, 1973.

Robert D. Whoriskey, New York City (Curtis, Mallet-Prevost, Colt & Mosle and Winthrop R. Munyan, Lester D. Bailey, and Alfred Grotell, New York City, of counsel), for appellant.

David E. Carmack, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., of the United States, Meyer Rothwacks, and Elmer J. Kelsey, Washington, D. C., on the brief), for appellee.

Before SMITH, MANSFIELD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This is an appeal from a decision of the Tax Court, 58 T.C. 423 (1972) deter-

mining deficiencies in income tax from the appellant, Garlock, Inc. (Garlock), for its fiscal year ending December 27, 1964, in the sum of $93,335.83, and that ending December 26, 1965, in the sum of $27,061.49. These determinations were made on the basis that Garlock, S.A. (S.A.), a Panamanian corporation and originally a wholly owned subsidiary of appellant, was a "controlled foreign corporation" (CFC) within the meaning of § 957(a) of the Internal Revenue Code of 1954, as amended, and against the claim that § 951 of the Internal Revenue Code of 1954, as amended, is unconstitutional. Section 951, which was enacted in 1962, provides that a United States shareholder of a CFC must include in income its pro rata share of the corporation's "subpart F income," as defined in § 952, whether or not that income has been distributed to the shareholder. All of S.A.'s income was subpart F income, and there is no question that appellant is a "United States shareholder" within § 951(b). Thus the primary question before the court is whether S.A. was a CFC during 1964 and 1965 within § 957 (a), which provides in pertinent part as follows:

> The term "controlled foreign corporation" means any foreign corporation of which *more than 50 percent of the total combined voting power* of all classes of stock entitled to vote *is owned* (within the meaning of § 958 (a)), or is considered as owned by applying the rules of ownership of § 958 (b), by United States shareholders on any day during the taxable year of such foreign corporation.

(Emphasis added.) While appellant concedes that it owned 50 per cent of the "total combined voting power" of all classes of stock entitled to vote, it contends that it did not own "more than 50 per cent" thereof so that S.A. was not a CFC. We disagree and affirm the Tax Court.

Appellant in 1964 and 1965, the tax years in question, was a publicly owned and listed manufacturer of industrial components such as gaskets, packings and seals. In 1958 it had organized S.A. with $50,000 in paid-in capital and for the purpose of marketing appellant's products in Europe and Asia. Through December, 1962, S.A. had one class of common stock issued and outstanding, all of which was owned by appellant. On December 4, 1962, however, the president of appellant submitted a written report to his board of directors proposing a recapitalization of appellant's subsidiary, S.A. That report, quoted in full in the Tax Court opinion, urged that, because the Revenue Act of 1962 contains provisions taxing earnings of CFC's after January 1, 1963, whether or not those earnings were repatriated as dividends, "To avoid this tax result it will be necessary to change the capital stock structure and voting rights in such a way that Garlock, S.A., will no longer be a 'controlled foreign corporation' as defined in the Revenue Act."

The report went on to spell out the proposed revision of the S.A. capital structure: Garlock would retain a $100,000 common stock investment (1,000 shares, $100 par) but S.A. would create a new issue of $100,000 callable, cumulative preferred stock (1,000 shares, $100 par), the preferred shares each to be entitled to one vote along with each common share. The report went on to propose that S.A. would "place this stock [the preferred] with foreign investors who understand our motives and are willing to vote their stock with us in return for an ample dividend rate—probably 8 per cent." It pointed out that Garlock would be "protected from loss of actual control by the following provisions in the preferred stock: a. Stock callable at any time. b. Preferred stock transferrable [sic] only with consent of Garlock, S.A." The report mentioned specifically two foreign investors who had been approached and had said that they "understood the situation," and expressed the belief that one of them would "invest" in the new preferred stock when issued.

The report was approved by Garlock's board of directors at the December,

1962, board meeting and the necessary authority delegated to management; the recapitalization was duly carried out by the directors and shareholders of S.A. under Panamanian law. The same special meeting of S.A. shareholders authorizing the recapitalization and the issuance of voting preference stock also amended the articles of incorporation to provide for the election of directors by a majority vote for terms of from one to five years, the term to depend upon the vote at the time of the respective election, and elected four directors to serve for a term of five years or until their successors were elected and qualified. These four included Garlock's president, vice president, export manager, and assistant secretary.

One of the two specifically mentioned investors in appellant's president's report was Willard International Financial Co., Ltd. (Willard), a Bahamian corporation, which happened to have as counsel the same law firm which was tax counsel to appellant. Willard was the parent corporation of Canadian Camdex Investments, Ltd. (Camdex), a Canadian corporation; Camdex subscribed to the S.A. preferred stock. While the callability provision and absolute restrictions on transferability were not included as terms of the subscription agreement, it was provided that the shares were to be transferable only with the prior written consent of the board of directors of S.A., which consent was not to be "unreasonably withheld." Additional safeguards to the subscriber included: (1) a provision for arbitration in the event of any dispute between the holders of the preferred and common shares as to any corporate matter relating to the business or affairs of S.A. or the rights, obligations or ownership of the preferred stock; (2) a provision to the effect that at all times S.A. was to retain a net current asset or working capital position of at least 200 per cent of the total par value of the preferred stock, i. e., $200,000, in the absence of which any preferred shareholder could demand a purchase at par by S.A.; and

(3) a provision giving each preferred shareholder the right after one year from date of issue, on 120 days' written notice, to sell the preferred stock to S.A. at par.

Camdex subscribed for the full $100,-000 of S.A. preferred with money from its parent, Willard, and retained 10 per cent of the 1,000 shares it thus received, selling 350 shares in February of 1963 to Nederlandse Overzee Bank, N.V., 350 shares to a nominee company for the Bank of Nova Scotia, and the remaining 200 shares to American African Finance Corp., a corporation organized under the law of French Somaliland. At the time of the issuance of the preferred stock the 8 per cent dividend rate it carried exceeded the interest rate prevailing in the foreign market. On October 1, 1963, the board of directors under Panamanian law duly amended S.A.'s bylaws to increase the number of directors from four to five; three Garlock men were retained, but the president of Willard (who was also an officer of Camdex) was added to the board as was the managing director of a Canadian investment banking concern which was the ultimate purchaser of the 350 shares bought for the Bank of Nova Scotia. No meeting of the shareholders of S.A. was held in 1963, but at an April 1, 1964, shareholders' meeting the five directors elected at the directors' meeting on October 1, 1963, were duly elected for one year or until their successors were elected and qualified. They were similarly re-elected on April 7, 1965. The above are the essential facts, and while the Tax Court opinion covers them in more detail, they will do for our purposes.

Appellant argues principally that § 957 (a) makes the CFC test only the simple mechanical one of ownership of more than 50 per cent of the voting stock, regardless of the ownership of the voting power. That is, appellant would read the words of the statute, "more than 50 per cent of the total combined voting power of all classes of stock entitled to vote," with utmost literality. Appellant

argues that the Tax Court majority opinion substituted an "actual control" test for the numerical statutory test and thereby ignored the plain meaning of the statute, erroneously interpreted the legislative intent and erroneously applied the doctrine of substance over form.

■ But, to go to the heart of the matter, the Tax Court opinion relied squarely on Treas.Reg. § 1.957–1(b)(2). This regulation provides, *inter alia*, that any arrangement to shift formal voting power away from United States shareholders "will not be given effect if in reality voting power is retained." It provides further that "The mere ownership of stock entitled to vote does not by itself mean that the shareholder owning such stock has the voting power of such stock for purposes of section 957." In the very situation of this case, where another class of stock is outstanding, the regulation states that

> the voting power ostensibly provided such other class of stock . . . will be disregarded [*1*] *if the percentage of voting power . . . is substantially greater than its proportionate share of the corporate earnings,* [*2*] *if the facts indicate that the shareholders of such other class of stock do not exercise their voting rights independently or fail to exercise such voting rights, and* [*3*] *if a principal purpose of the arrangement is to avoid the classification of such foreign corporation as a controlled foreign corporation under section 957.*

(Emphasis added.) Here the Tax Court properly found, on the basis of the original "report" to appellant's board of directors, that a principal purpose of the arrangement was to avoid the classification of S.A. as a CFC; appellant cannot and does not argue to the contrary. While it is suggested that the holders of the preferred *could* have exercised voting rights independently, in fact there is no indication that they did so, and indeed at all times a majority of the board of directors consisted of appellant's offi-

cers. Finally, the percentage of mathematical voting power of the preferred shareholders (50 per cent) was substantially greater than its proportionate share of the corporate earnings: in 1963, 1964 and 1965 S.A.'s net profit was $94,-260.61, $173,382.60 and $50,171.20 respectively, but the preferred shareholders received dividends of only $8,000 per year—in other words, in the year 1965 a maximum of 16 per cent. The regulation, in short, applies exactly to the case at hand. Appellant's argument that the preferred shareholders of S.A. did exercise their voting rights independently, Brief at 44, is not seriously pressed. Rather, the appellant claims that the regulation must be held invalid as an arbitrary and unsanctioned extension of the statute, one contrary to the "legislative intent."

■ We believe, however, that the regulation, as applied to the facts in this case, is proper and within the direct aim and purpose as well as the plain meaning of the statute. The test in the statute is one of ownership of "voting power," a term which, to be sure, is open to at least two different interpretations: appellant's would relate it solely to the record ownership of the number of votes attached to all classes of stock entitled to vote; appellee's interpretation is that ownership of voting power is to be determined after full consideration of legal and equitable aspects of ownership. The statute was enacted to help effectuate "elimination of the tax haven device," as set forth in President Kennedy's recommendations on tax revision, *see* H.R.Doc. No.140, 87th Cong., 1st Sess. 7 (1961). The Ways and Means Committee report on the Revenue Act of 1962 stated that "Your committee has also ended tax deferral for American shareholders in certain situations where the multiplicity of foreign tax systems has been taken advantage of by American-controlled businesses to syphon off sales profits from goods manufactured by related parties either in the United States or abroad." H.R.Rep.No.1447, 87th Cong., 2d Sess.

58 (1962). *See also* S.Rep.No.1881, 87th Cong., 2d Sess. 2, 78–80 (1962). In floor debate on the bill Senator Kerr specifically referred to the fact that, if the bill were passed, "It will no longer be possible to flout our tax laws by simply setting up an address company, say in Panama, to sell goods in Europe which did not originate in Panama, which never in fact were in Panama, and which had nothing to do with Panama." 108 Cong.Rec. 17752 (1962). As Secretary of the Treasury Dillon had testified, the Administration's "primary objective in this field . . . [was] to preserve the integrity of the U.S. dollar and to help in the balance of payments. . . ." Hearings Before the House Committee on Ways and Means on the President's 1961 Tax Recommendations, 87th Cong., 1st Sess. 348 (1961). In the light of this legislative history, the appellee's implementation of congressional intent by promulgation of regulations consistent with the statutory design seems to us plainly correct.[1]

Taxpayers generally are fond of quoting Judge Learned Hand's statement that "Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." Helvering v. Gregory, 69 F.2d 809, 810 (2d Cir. 1934), aff'd, 293 U.S. 465, 55 S.Ct. 266, 79 L. Ed. 596 (1935). It is sometimes forgotten, however, that it was in that very case that Judge Hand's opinion for this court held that a series of transactions which suited the verbal definition of corporate reorganization in the Revenue Act of 1928 nevertheless did not meet the statutory requirements because the transactions lacked a business purpose

and the words of the Act made it evident that the aim of Congress was to approve only reorganizations having such a purpose. As Judge Hand said with reference to the tax statute there involved, "the meaning of a sentence may be more than that of the separate words, as a melody is more than the notes, and no degree of particularity can ever obviate recourse, to the setting in which all appear, and which all collectively create." *Id.* at 810–811. So too, here, it does not advance the cause a very great deal to say that the "purpose" of Congress or the "intent" of Congress was violated by the regulations adopted. Certainly as the statute indicates, Congress had generally in mind the elimination of the tax avoidance device known as "tax haven" corporations. The language it used is subject to the interpretation—one given to it by the Treasury—that it is "real" voting power and not the mere mechanical number of votes with which Congress was concerned. As Professor Cox reminded us some time ago, "legislative intention" is really simply a metaphor, which "does not state an all-sufficient rule; it enjoins a point of view and sets a goal to which the judge aspires even while he knows it is beyond attainment." Cox, Judge Learned Hand and the Interpretation of Statutes, 60 Harv.L.Rev. 370, 372 (1947). It is significant here that the taxpayer sought out parties who understood both its motives and its situation. It is significant also that the terms of the arrangement worked out were such that the preferred shareholders would have no interest in disturbing the taxpayer's continued control. The stock was made attractive by paying a rate in excess of market for the money advanced. The stake of the preferred shareholders was, moreover,

---

1. Appellant argues that the Treasury originally proposed either a voting power or a value of stock test but that since Congress used only the former, there was a "conscious decision to limit the definition of a controlled foreign corporation." Appellant's Brief at 21. This does not mean, however, that the voting power test ultimately adopted was to be applied strictly mechanically, as appellant would

have it. Nor does it follow that, because the statute requires that the requisite percentage of voting power be owned only on any one day in the taxable year, Congress was thereby rejecting effective voting control as the test in a case where that effective voting control was vested in the United States shareholder.

quite limited, since the moment the current asset value of S.A., or its working capital was not maintained at a level of at least 200 per cent of the total par value of the preferred, i. e., $200,000, any preferred shareholder could demand a purchase by S.A. at par; indeed, after one year the preferred shareholders had the right on 120 days' written notice to require S.A. to purchase the preferred at par, that is, to have his original investment returned in full.

While the arbitration provision in respect to unresolved matters we might assume to be proper under Panamanian law—without indicating whether indeed Panamanian law was applicable [2] or, if applicable, that the provision would be valid [3]—there is no question but that there would be little or no reason ever to resort to such an unrealistic way of running a corporation in light of the working capital and provisions for the repurchase of the preferred stock above recounted. We say "unrealistic" because the picture of corporate sales, management and other decisions in the fast-moving international trade world of the mid-1960's being made through the process of arbitration under the rules of the International Chamber of Commerce is very nearly risible—the product, perhaps, of an imaginative tax lawyer's drafting contemplation, surely not a working solution to real business needs. Without belaboring the point one is tempted to think of the arbitration provisions of the subscription agreement as sugar coating on the taxpayer's Treasury Department pill.

While in a given case the issuance of a different class of stock with equal voting rights might meet the "voting power" requirement in the statute, quite obviously Congress could not generally have conceived all the ramifications of corporate laws around the world which might cleverly be utilized to make a preferred stock which was rather readily redeemable and carried only a very small percentage of the earnings as interest the equivalent in voting power of common stock held by the United States shareholders.

We agree with the appellee that the preferred shareholders' voting power here was "illusory." [4] We agree also that the regulation is valid and proper as applied to the facts presented. The argument that § 951, which requires an American shareholder to include in income his pro rata share of a CFC's profits, is unconstitutional we think borders on the frivolous in the light of this court's decision in Eder v. Commissioner, 138 F.2d 27, 28 (1943). That case held constitutional the foreign personal holding provisions of the income tax laws upon which subpart F was patterned, permitting taxation of United States shareholders on the undistributed net income of Colombian corporations even

2. The subscription agreement, Exhibit 8, was in the form of a letter from Camdex accepted by S.A. It does not refer to any particular law to govern the interpretation or operation of the agreement. The arbitration paragraph (2) provided, inter alia, that there would be one arbitrator, that he would be chosen by the president of the International Chamber of Commerce, and that the arbitration would be held in New York City. Canadian, Bahamian and New York law are all possible alternatives to Panamanian law; there may be others.

3. For example, under New York law, were it held to apply, a corporation's affairs cannot be run under an agreement depriving directors of their power to act for and in the best interests of the corporation. Ripley v. Storer, 139 N.Y.S.2d 786 (Sup.Ct.), aff'd, 286 App.Div. 844, 142 N.Y.S.2d 269 (1955), modified on other grounds, 309 N.Y. 506, 132 N.E.2d 87 (1956).

4. This renders inapplicable such cases as Granite Trust Co. v. United States, 238 F.2d 670 (1st Cir. 1956), relied upon by appellant, where the transfer of 20.5 per cent of the stock of a wholly owned subsidiary to a friendly party was held to give the parent less than 80 per cent of "combined voting power" so as to permit it to recognize a loss on liquidation of the subsidiary under § 112(b)(6) of the Int.Rev.Code of 1939. There the voting power transferred was real.

though Colombian law made the taxpayer unable to receive such income in the United States in excess of $1,000 per month.[5] See also Alvord v. Commissioner, 277 F.2d 713 (4th Cir. 1960); Marsman v. Commissioner, 205 F.2d 335 (4th Cir. 1953).

Judgment affirmed.

See also, D.C., 58 F.R.D. 429.

---

5. Appellant argues that the "constitutional" issues presented in *Eder* were in fact "apparrently" waived in that case and that, therefore, *Eder* does not control our decision here. We disagree with appellant's reading of *Eder*, and note particularly Judge Frank's explicit reference to and paraphrase of Heiner v. Mellon, 304 U.S. 271, 281, 58 S.Ct. 926, 82 L.Ed. 1337 (1938). Whatever may be the continuing validity of the doctrine of Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521 (1920), as applied to the facts in this case it has no validity under *Mellon*. *See also* cases cited 138 F.2d at 29 n. 2.