PIGGY BANK STATIONS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; PIGGY BANK INC. AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Piggy Bank Stations, Inc. v. Commissioner
Docket Nos. 1471-79; 1549-79
United States Tax Court
T.C. Memo 1982-365; 1982 Tax Ct. Memo LEXIS 387; 44 T.C.M. (CCH) 299; T.C.M. (RIA) 82365; June 28, 1982
*387 Held: Various sums disbursed by petitioner were not made with an intent to create an indebtedness of the payee to the payor; therefore, petitioner was not entitled to claim bad debt deductions with respect to these disbursements. Towner Leeper, for the petitioners. William D. Peltz, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: * Deficiencies were determined against petitioners as follows: PIGGY BANK STATIONS, INC.
Tax Year Ended
Deficiency
November 30, 1969
$   1,424
November 30, 1972
25,034
November 30, 1974
191,978
November 30, 1975
63,080
*388 PIGGY BANK INC. AND SUBSIDIARIES
Tax Year Ended
Deficiency
October 31, 1976
$   4,828
These deficiencies all result from disallowance of bad debt deductions, which had created net operating losses carried back and forward to the years listed above. Bad debt deductions were claimed by Piggy Bank Stations, Inc. (Stations), in its fiscal year ending November 30, 1975, in the amount of $ 294,367, all of which is challenged by respondent. In its short fiscal year ending March 31, 1976, Stations deducted bad debts in the amount of $ 347,529. Respondent has conceded $ 26,424 of this amount, leaving $ 321,105 in dispute. Piggy Bank Land Company (Land) claimed a bad debt deduction in its short fiscal year ending March 31, 1976, in the amount of $ 8,500, all of which is in dispute. The following tables show as to each petitioner the components of the disputed bad debts, allocated into categories conforming to our findings of fact and the analysis of the *389 applicable laws: Table A
Allocation of Claimed Bad Debts in the Categories I, II and III
A. Stations' fiscal year 1975 bad debt write-off: Category III
$   294,367.00
Total for 1975 bad debts
$   294,367.00
Stations' fiscal year 1976 bad debt write-off: Category I
$    55,234.65
Category II
244,870.35
Category III
21,000.00
Total for 1976 bad debts
$   347,529.00
Conceded by respondent
$    26,424.00
Disputed by respondent
321,105.00
B. Land's fiscal year 1976 bad debt write-off: Category II
$  8,500.00
Total for 1976 bad debts
$  8,500.00
Table B
Explanation of Categories
I. Distributions by Stations to Sam S. Klink on or about March 31, 1976, in connection with sale by him of the stock of Stations and Land: 1. Assumption of debt of William A.
Johnstone
$    4,588.11
2. Cash value of life insurance
policy on Sam S. Klink owned by
Stations
37,954.75
3. Distribution to Sam S. Klink of
his vested interest in terminated
profit-sharing plan
12,691.79
Total category I bad debts claimed
by Stations in fiscal 1976
$   55,234.65
*390 II. Advances by Stations and Land to Browne & Klink partnership in connection with acquisition by Land of filling stations: 1. Advances by Land, claimed as bad
debt in fiscal 1976
$    8,500.00
2. Advances by Stations to Browne &
Klink partnership in connection
with acquisition by Land of filling
stations, claimed as bad debts in
fiscal year 1976
244,870.35
Total category II bad debts
$  253,370.35
III. Advances by Stations to or for the benefit of General Computer Service, Inc.: 1. Advances to Browne & Klink
partnership earmarked for General
Computer Service, Inc., and
claimed as bad debt in fiscal 1976
$   21,000.00
2. Advances to General Computer
Service, Inc., claimed in fiscal
1975
294,367.00
Total category III bad debts
$  315,367.00
Stations and Land were until March 31, 1976, affiliated corporations, each being owned in equal shares by Sam S. Klink (Klink) and William A. Johnstone (Johnstone). Stations was an operator of gasoline stations, some of which were owned by it. Other filling stations were owned and leased to Stations by Land, and *391 others were leased to Stations by unrelated parties. Klink handled financial matters for these corporations, while Johnstone concentrated on managing Stations' business. Klink was also one of the two equal partners in the Browne & Klink partnership (B & K), which was engaged in various land development projects. These projects included locating station sites and designing and constructing filling stations to be operated by Stations and in most cases to be owned by Land. The record does not disclose what compensation B & K received from Stations and Land for these services. Robert F. Browne managed the activities of B & K, and Klink handled its financial affairs. General Computer Service, Inc. (Computer), was formed prior to 1972, at least in part at the insistence of Klink, to capitalize on computer programs which had been developed by two unrelated individuals, Johnstone and Stations' independent accountant to facilitate internal reporting and accounting control of Stations' business. Stations, Klink and Johnstone, among others, became stockholders in Computer. All of these individuals and companies were residents of El Paso, Texas, during the periods of time here involved, *392 and it is stipulated that petitioner corporations were residents of El Paso when the petitions herein were filed. As of March 31, 1976, Klink and Johnstone sold their stock in both Stations and Land to petitioner, Piggy Bank Inc. (Purchaser), a new corporation which was formed by two individuals to effect this purchase. The sale was consummated on March 31, 1976, pursuant to a contract of sale between Klink and the two individuals. The filling station properties and most other assets were included in the 1976 sale, with Purchaser assuming liability for any indebtedness secured by any liens on the properties. Respondent contends that none of the disputed amounts constitute bad debts, with alternative contentions as to the year in which the bad debts should be deemed worthless if determined by the Court to constitute bad debts. Before we turn to an analysis of the particular purported bad debts, we note certain basic principles which are controlling here. It is well settled that whether or not advances or disbursements by a taxpayer are to be treated as debts for tax purposes is a question *393 of fact to be determined on the basis of all the facts and circumstances. Many factors have been used by courts to assist in distinguishing debts from equity additions, constructive dividends, and gifts, no one of which is conclusive. Gilbert v. Commissioner, 262 F.2d 512 (2d Cir. 1959), cert. denied 359 U.S. 1002 (1959). It is also hornbook law that the substance rather than the form of the transaction will be looked at for tax purposes. Gregory v. Helvering, 293 U.S. 465 (1935). In dealings between related parties, the characterization by the parties of a transaction is "to be recognized or disregarded for tax purposes according to the extent to which they [the parties] comply with arm's-length standards * * *." Nassau Lens Co. v. Commissioner, 308 F.2d 39, 46 (2d Cir. 1962), remanding 35 T.C. 268 (1960). The taxpayer has the burden of establishing the debt characterization. See, e.g., Jewell Ridge Coal Corporation v. Commissioner, 318 F.2d 695 (4th Cir. 1963), affg. a Memorandum Opinion of this Court; Gilbert v. Commissioner, supra; Saigh v. Commissioner, 36 T.C. 395 (1961). *394 We conclude that petitioners have not met their burden of proof. While each of the different categories of disbursements requires a slightly different analysis, we find as to each category the same ultimate fact -- the disbursements were not made with the intent to create an indebtedness of the payee to the payor. [1]
Category I Bad Debts
The sale of Stations and Land was handled in two steps. First, Klink purchased Johnstone's interest in each corporation for cash. Then Klink sold all of the shares of stock to Purchaser for cash, with most of the cash being paid to secured creditors of Klink. Both Johnstone and Klink received distributions from Stations' profit-sharing plan which was terminated, apparently in contemplation of the sale. Klink's distribution, but not Johnstone's, was treated as an advance to B & K (one of the category I items) and was included in Stations' fiscal 1976 bad debt deduction. A policy *395 of life insurance on Klink's life which was owned by Stations was, pursuant to the contract with Klink, distributed to him. The cash surrender value was also treated as a bad debt owing to Stations. Also in connection with the consummation of the sale and to settle a dispute as to whether Johnstone should have repaid to Stations the additional sum of $ 9,176.22, Klink agreed to assume an obligation for one-half of that sum or $ 4,588.11. (This constitutes the third category I item.) The record does not disclose how or whether this sum was actually paid to Stations but out of Klink's share of the sale proceeds, the sum $ 6,981.51 was paid to Stations to pay "personal bills." Both Klink and B & K were insolvent at this time. At some later time, Johnstone purchased from Stations certain life insurance policies on his life. Little discussion is required with respect to the transfer to Klink in connection with the sale of the stock in Stations and Land of the insurance policy on his life. Such disposition of this type of corporate asset is a common occurrence where the ownership of a closely held corporation changes hands. The corporation would have no use for the policy except to *396 realize its cash surrender value when the insured employee terminated his employment. The distribution by the corporation of an asset to a shareholder-employee or a former shareholder-employee without any consideration flowing to the corporation would be expected to have some tax consequence. Economically and realistically, the cash surrender value added to the consideration received by Klink for the sale of the stock of Stations. The withdrawal of this asset might have been treated as a dividend to Klink or to Purchaser, perhaps depending upon timing. But without question, this transaction could not and did not create an indebtedness of B & K to Stations. Neither did Klink thereby become indebted to Stations. The transfer was pursuant to an express provision of the contract of sale between Klink and Purchaser. The somewhat loose language in the supplemental stipulation of facts cannot create a debt where none existed. We find and hold that the cash surrender value of this policy did not become a debt owing to Stations. The record is devoid of any description of the pension and profit-sharing plan except for the facts recited in the copy of Stations' fiscal 1972 Federal income *397 tax return. There the plan is described as a profit-sharing plan qualified under section 401. [2] In the absence of facts to the contrary, we will assume that the plan continued as a qualified profit-sharing plan up to its termination in connection with the sale of stock in 1976. Upon that event the plan assets vested (if not already vested) and were required to be distributed to the plan participants, including Klink and Johnstone. Section 411(d)(3). There is nothing to indicate that Stations, either before or after the sale of its stock, had any claim to the assets in the profit-sharing plan. Here also, the facts simply preclude the treatment of this distribution to Klink of plan assets as an indebtedness owed by B & K or him to Stations. The distribution would have tax consequences to Klink but he is not before this Court. The remaining category I item is one-half of an alleged debt of Johnstone to Stations, which arguably should have been paid to Stations by Johnstone out of his share of the cash paid for his Stations stock. Petitioner argues that this was *398 a valid debt of Johnstone, which to the extent of $ 4,588.11 according to the stipulation was "assumed" by Klink. Since Klink was insolvent, petitioner disposes of this issue on the ground that respondent is bound by the stipulation. We have found that there was a dispute as to this indebtedness of Johnstone to Stations and that Klink assumed one-half of the amount. The facts are incomplete on this issue, as on most other issues in this case. We conjecture that the assumption by Klink "To avoid upsetting the sale * * *" as stipulated by the parties must have involved Purchaser, which knew at the time that Klink was insolvent. We can further surmise that this sum was included in the personal bills of Klink which were repaid to Stations out of the sale proceeds. That is the only logical construction of the events, but we cannot find such facts on this record. However, there is nothing to indicate that this sum became part of an indebtedness of B & K to Stations. The inclusion of these three category I items in Stations' bad debt write-off appears at best to have been a frivolous claim even though surprisingly respondent has not so treated it. Petitioners clearly have not proven *399 that any of these three items constituted an indebtedness of B & K due to Stations which existed after the consummation of the sale. We hold for respondent on these three issues. Category II Bad Debts
Funds to pay the costs incurred by B & K in the building design and construction of filling stations to be operated by Stations were generally advanced by Stations to B & K, but in one instance were advanced by Land. These funds were treated for book purposes when advanced as receivables owed by B & K to Stations or to Land which were to be cancelled or repaid out of permanent financing obtained from unrelated parties. [3] The balances in these accounts on the books of Stations and Land were written off as bad debts as of March 31, 1976, the date these corporations were sold. Petitioners' treatment of these so-called advances from *400 Stations and Land to B & K which were used to defray the acquisition cost of new filling stations does not stand on a much stronger footing than their position with respect to the insurance policy, the profit-sharing plan distribution and the Klink assumption. Since the facts are more complete with respect to the $ 8,500 claim of Land, we take that as the best paradigm of the parties' practices. On various dates starting on June 7, 1966, through December 15, 1966, relatively small amounts of cash were apparently deposited by Land to B & K's account. On December 31, 1966, the sum of $ 25,000 was transferred to B & K with a journal entry description of "Construction advance on Las Cruces Station." Also on the same date two other journal entries show as debits to the account, the sum of $ 2,000 described as "Reduce advances on Las Cruces Station" and the sum of $ 35,500 described as "Income due on construction." Two further small cash deposits were made to the B & K account, one in January 1967 and the second in March 1968, leaving a credit balance of $ 8,500 of Land's books. The record does not indicate whether any of the "deposits" were derived from permanent financing. Also, the *401 record fails to show what cost for this station was capitalized on Land's books and whether or the extent to which journal entries in the capital accounts of Las Cruces station correspond to the entries in the B & K advance account, but based on the record we must assume that there would be a correlation. There is nothing whatsoever in the record to indicate that there was at any time between June 7, 1966, and March 21, 1968, any intent on the part of either party that the excess of the advances over the items reducing the advances constituted an indebtedness of B & K to Land except the bare fact that Land apparently treated the transaction on its books for some purposes as an account receivable. There was no repayment by B & K of any part of this sum during the eight-year period between the March 1968 advance and the sale of Land in March 1976, and we must assume that B & K was solvent during most of this time. There was no agreement as to interest. And of even greater significance, the testimony is that repayment, or perhaps more properly the liquidation, of the so-called receivable was intended to be made out of permanent financing from third parties. At least that was the practice. *402 While much is left to conjecture on this record, we find no basis for characterizing this $ 8,500 item as a debt outstanding in 1976. [4] It is more reasonable to conclude that Land's cost for work by B & K on the Las Cruces filling station was $ 46,000, the aggregate of the advances. Petitioners have not sustained their burden of proof with respect to the $ 8,500 item. With respect to the additional so-called advances by Stations to B & K amounting to $ 244,870.35 in connection with the acquisition of new filling stations, the testimony shows, and we find, that the transactions were handled in a similar fashion to Las Cruces Station except for the inability of the parties to obtain third-party financing for some of the stations because of the economic situation during the years 1973 and 1974. This circumstance can have no bearing on whether or not the advances by Stations to B & K should be characterized as loans. There was no agreement as to an interest rate or as to repayment dates or even as to an obligation of B & K to repay. According to the testimony, *403 repayment was to be made out of third-party financing with the necessary implication that Stations or Land would be responsible for repayment to such lenders. It is true that Johnstone and Klink both testified that they expected Stations would be repaid for these advances, but each also testified that the advances were made to defray B & K's costs. Johnstone stated: "They [B & K] were building those stations for us and we'd advance them money. When the loans would come through they were handled by the accountant, credit or debit." There was no mention of fixed price contracts with B & K, or that the unpaid receivables constituted advances in excess of an agreed upon cost. Petitioners have failed to prove that these category II sums constituted debts owing by B & K to Stations and to Land, respectively. We hold for respondent on these issues. Category III Bad Debts
As we analyze this case, it is only with respect to the disbursements by Stations to or for the benefit of Computer that any legitimate question can arise as to the creation of an indebtedness. Several years prior to the period involved here, two unrelated individuals interested Johnstone in a computer program *404 to assist Stations in promptly deriving necessary financial reports of the filling station activities. After some refinement of the program through the efforts of Johnstone and others, Klink became interested in attempting to merchandise the program. For this purpose Computer was formed, with the stock being held by various individuals, including Klink, Johnstone and the two men who first brought the computer program to Johnstone. Stations also became a shareholder, apparently by conversion of a portion of its initial advances into stock. Computer was substantially undercapitalized from its inception. From some time before December 31, 1972, through December 1974 the operating expenses of Computer were paid in whole or in part with funds derived from Stations. Advances were in part made directly to Computer and in other instances to third parties for expenses incurred on behalf of Computer. Some of the advances were reflected by promissory notes payable on demand and some were simply carried as receivables. [5] No payments of interest or principal were made on any of these notes or advances. These notes and advances aggregated $ 294,367 by the end of Stations' 1975 fiscal year, *405 which sum was written off as a bad debt on Stations' fiscal 1975 tax return. An additional sum of $ 21,000 was advanced by Stations for the benefit of Computer. This amount was actually advanced to B & K and by it disbursed for or to Computer. The claimed worthless bad debt owed by B & K in the amount of $ 321,105 included this sum. The record does not indicate when this advance, or series of advances, was made but it must have occurred prior to January 3, 1975, when Greyhound Computer Corporation (Greyhound) took over Computer's business. The record does not explain why B & K was injected into this picture. The stipulation recites that: 32. * * * It also includes an amount of $ 21,000 set out on the books of Stations as being an advance to General Computer but carried in the B & K account because it was advanced to B & K and spent by B & K on behalf of General Computer. * * * We find on this record that B & K acted simply as a conduit. *406 This sum should be classified and treated in a manner identical to the sums advanced by Stations directly to or for the benefit of Computer. During this period, 1972-1974, Computer incurred substantial amounts of secured and unsecured indebtedness, including a Small Business Administration loan totaling more than $ 300,000, which required that some shareholder advances be subordinated. Almost $ 500,000 of unsecured notes of Computer were guaranteed by certain stockholders, and $ 300,000 on an unsecured note payable to Greyhound was also guaranteed by certain stockholders. Much of this indebtedness was shown as past due on Computer's balance sheet for October 31, 1974, as well as its balance sheet for October 31, 1975. By the end of its 1974 fiscal year, net operating losses of almost $ 3,000,000 had been incurred. On January 3, 1975, a contract was entered into with Greyhound pursuant to which all of the business and assets were transferred to Greyhound except for certain sums due under land contracts, in return for royalties. By May or June of 1975, Greyhound advised Klink and others that it would exercise its option to terminate its contract with Computer and the termination *407 was actually effective in early 1976. This ended any possible hope of Computer becoming profitable. The formation of Computer had no essential relation to the business purposes of Stations. It was not until after Stations had developed the computer programs to the point that they were working satisfactorily for Stations that the idea of merchandising those programs to third parties came into being. The incorporation of Computer was not necessary for Stations to utilize the software developed in part by Johnstone. It is not even clear from the facts that Stations could not have provided all of the computer service it needed itself through its own resources. Klink exercised unfettered control over the finances of Stations, Land and B & K and freely withdrew funds from Stations for Computer's benefit, some of which were, as we have found, channeled through B & K. The manner in which Klink handled the partial financing of Computer out of Stations' excess capital suggests characterization of the advances as constructive dividend distributions to him. [6] Johnstone testified, for example: Q Did he [Klink] ever consult with you? A He'd give a check -- oh, yeah, he'd tell me what *408 he was doing. Most of the time -- I mean, we weren't working together. I might be gone or anything. And if he needed the money, he drew the money. We'd see each other, have meetings, and then I was informed. Q And when he did this, it met with your approval? A Yeah, it was all right. He was a 50-50 partner. * * * Q Did there come a time when you became concerned about the amount of money that was being taken from Stations and being invested in General Computers? A Well my only objection was, Sam taking the money, was we were constantly in a cash bind, you know, to pay our own bills. That was my concern. But as far as him utilizing the money, I mean, half of it was his money. Respondent has not, however, pressed this analysis. Rather, respondent contends that these so-called advances were capital investments and in any event were not debts for tax purposes. We agree that petitioners have not shown that an indebtedness for tax purposes was created. *409 Among the factors which we consider most critical in determining whether an advance should be characterized as a loan are the presence or absence of an agreement as to interest, the payment of interest and principal, the existence of an immediate ability to repay an advance, the furnishing of collateral or other security for the advance and whether or not an unrelated third party would have made a loan under the circumstances. Jewell Ridge Coal Corporation v. Commissioner, 318 F.2d 695 (4th Cir. 1963), affg. a Memorandum Opinion of this Court; Nassau Lens Co. v. Commissioner, 308 F.2d 39, 46 (2d Cir. 1962), remanding 35 T.C. 268 (1960). The fact that the advances were entered on the parties' books as loans is not conclusive. Road Materials, Inc. v. Commissioner, 407 F.2d 1121 (4th Cir. 1969), remanding on other grounds a Memorandum Opinion of this Court. Neither is the characterization by the parties in testimony given at a later date of much assistance when it is not buttressed by evidence of contemporaneous facts. Road Materials, Inc. v. Commissioner, supra.
Petitioners have emphasized *410 that Computer was undercapitalized from the start, a factor tending towards characterization as equity rather than debt. Montclair, Inc. v. Commissioner, 318 F.2d 38 (5th Cir. 1963); Rowan v. United States, 219 F.2d 51 (5th Cir. 1955). Of significance also is the fact that Computer was never profitable and was insolvent when most if not all of these advances were made. The record shows that much of the stockholder indebtedness was directly or by implication subordinated to other loans. While the record does not reveal which stockholders were required to subordinate their indebtedness and which were required to guarantee loans by others, it seems more than probable that with Klink's heavy participation in financial activities and his status as the largest single shareholder of Computer, he must have been one of those required to subordinate and to join in the guaranties. It is a safe assumption also that such action by him extended to Stations' advances since Stations was the third largest shareholder. It is inconceivable that any unrelated party would have made a subordinated loan without collateral to Computer under these circumstances, a fact *411 strongly indicating the advances were not loans. See Tomlinson v. 1661 Corporation, 377 F.2d 291, 298 (5th Cir. 1967). At some point either in late 1973 or early 1974, Computer was in fact unable to obtain additional financing from any outside sources. We are not unmindful of the fact that between December 31, 1972, and August 5, 1974, Computer executed seven promissory notes, payable on demand with 10 percent interest, aggregating $ 188,338.52. But on October 23, 1973, and during February 1974, there were also two advances to Computer, each in the amount of $ 50,000. No reason for the failure to evidence these two advances by notes is given. Thereafter, between August 1974 and December 1974, the aggregate of $ 6,028.48 was disbursed to various unrelated parties apparently for Computer's benefit. Finally, at some time or times prior to December 1974, the aggregate sum of $ 21,000 was disbursed by B & K on behalf of Computer out of funds supplied to B & K by Stations for that purpose. There is no evidence that Computer had the financial capability of repaying any of these advances when made, whether or not evidenced by a note. The only hope of repayment was profitability *412 at some indeterminate time in the future, and this gamble upon possible future earnings does not warrant finding the advances to be debts. See Funk v. Commissioner, 35 T.C. 42, 50 (1960). Petitioners argue that Computer was not thinly capitalized, pointing only to evidence of its capitalization on December 31, 1974. This may be correct as of that date, but it is not only undisputed but forcefully argued by petitioners that Computer was undercapitalized from its organization. Some of the equity was derived from the conversion of advances, which apparently was the origin of Stations' equity interest. Almost $ 1,500,000 was created during 1974 in connection with some acquisitions. It is evident that at the commencement of Stations' financing of Computer, and apparently throughout the period of Computer's business activities, Klink recognized that no current repayment was possible. That depended finally upon Greyhound's success after it acquired the software operations. Petitioners emphasized on brief American Processing and Sales Co. v. United States, 178 Ct. Cl. 353, 371 F.2d 842 (1967) and Byerlite Corporation v. Williams, 286 F.2d 285 (6th Cir. 1960), *413 but we believe the opinion of the Fourth Circuit in Road Materials, Inc. v. Commissioner, supra, properly distinguishes the facts in this case. There was no business reason for Stations' advances and none of the advances were repaid. [7]
We are again forced to conclude that petitioners have not satisfactorily demonstrated on this record that the advances to and for the benefit of Computer constitute indebtedness for Federal tax purposes. Decisions will be entered for the respondent. Footnotes
*. This case was tried before Judge Cynthia H. Hall, who has resigned from the Court. By order of the Chief Judge, dated January 13, 1982, the case was reassigned to Judge Meade Whitaker for disposition.↩
1. While the transfer by Stations to Klink of the insurance policy on his life technically was not a disbursement of funds, we have treated it for convenience as equivalent to a cash disbursement of the cash surrender value since the parties have done so.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
3. It is not clear from the record how and by whom land costs were paid and when title passed to Land or Stations. Such costs apparently were not included in the so-called advances to B & K. Neither is it clear how such third party financing was handled, but the obligation to repay such lenders must have been that of Stations or Land.↩
4. Compare Gutierrez v. Commissioner, 53 T.C. 394↩ (1969), affd. per order (D.C. Cir., Dec. 9, 1971).
5. The first note, dated December 31, 1972, reflected prior advances aggregating in excess of $ 62,000, approximately $ 19,000 of which was at that time converted into common stock issued to Stations and the balance into this note.↩
6. Apparently on Stations' books the advances to Computer were recorded as due from "one of the principal officers," presumably Klink.↩
7. We do not consider the reorganization of Stations' first block of advances into a combination of stock and a demand note to constitute a repayment.↩